587 A.2d 54

## NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Petitioner,

v.

## PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 31, 1990.

Decided Feb. 14, 1991.

Michael W. Gang, with him, Michael W. Hassell, Morgan, Lewis & Bockius, Harrisburg, and Heino H. Prahl, Buffalo, N.Y., for petitioner.

Veronica A. Smith, Deputy Chief Counsel, with her, Lawrence Barth, Asst. Counsel, Harrisburg, for respondent.

Philip F. McClelland, Asst. Consumer Advocate, Harrisburg, for Irwin A. Popowsky, Acting Consumer Advocate.

Before CRAIG, President Judge, and DOYLE, PALLADINO, McGINLEY, PELLEGRINI, KELLEY and BYER, JJ.

CRAIG, President Judge.

National Fuel Gas Distribution Corporation (NFG) appeals a decision of the Pennsylvania Public Utility Commission (PUC or commission) that refused to place in effect NFG's proposed tariff supplement, through which NFG sought to recover contract reformation costs, commonly referred to as take-or-pay costs (TOP costs), under the gas cost rate adjustment mechanism of § 1307(f) of the Public Utility Code, 66 Pa.C.S. § 1307(f), providing for prompt recovery by the utility of increases in the cost of gas purchased by it. We affirm.

Generally speaking, TOP costs are charges that interstate pipeline suppliers impose upon local gas distributors (LDCs), such as NFG, under cost recovery procedures established by the Federal Energy Regulatory Commission (FERC) in accordance with FERC regulations.

An Administrative Law Judge (ALJ) conducted hearings on the proposed tariff supplement and NFG's TOP costs. The ALJ issued an opinion on June 8, 1989, in which he noted that the PUC had issued a proposed policy statement which indicated that the commission did not regard TOP costs as purchased or natural gas expenses that an LDC may recover under § 1307(f). The ALJ distinguished TOP costs, quoting the commission's policy statement which described TOP costs as arising

> out of a failure, for whatever reasons, to purchase gas. As such, there is no basis in fact or in law that would mandate their recovery through a purchase gas expense recovery mechanism. These costs represent a cost whose recovery should be addressed in a base rate proceeding.

Recommended decision of the Administrative Law Judge, p. 39.

After NFG filed its § 1307(f) tariff, and after the commission filed its proposed policy statement, but before the commission adopted its Final Statement of Policy, in which it reaffirmed its proposed policy, NFG filed a tariff supplement under § 1308 of the Public Utility Code, 66 Pa.C.S. § 1308, in which it also sought to recover its TOP costs in a base rate proceeding.[1] In that proceeding, the PUC approved the tariff NFG submitted, allowing NFG to recover all of its TOP costs known at the time it filed the tariff. However, the commission refused to allow recovery of TOP costs that, NFG anticipates, one of its pipeline suppliers will ultimately pass through to NFG. NFG appealed the commission's refusal to permit recovery of those anticipated costs; however, the company withdrew its appeal.

### 1. The issues

Initially, the PUC and the Office of the Consumer Advocate (OCA) raise jurisdictional and other preliminary chal-

---

1. Under § 1308, utilities may file tariffs with the commission through which they seek rate increases. The commission has wide discretion under this section to determine the extent and type of adjustments to be made to a utility's base rate. *Philadelphia Electric Company v. Pennsylvania Public Utility Commission*, 93 Pa.Commonwealth Ct. 410, 429, 502 A.2d 722, 731 (1985).

lenges to NFG's appeal, contending that: (1) the commission adjudicated the issues NFG now raises on appeal in the base rate proceeding, which is no longer subject to appeal; (2) collateral estoppel precludes NFG from challenging the commission's decision to disallow recovery of TOP costs in the base rate case in this § 1307(f) proceeding; (3) the commission's order in the base rate proceeding renders this appeal moot; (4) the commission's order is not a final, appealable order with respect to NFG's TOP costs; and (5) NFG has failed to demonstrate that it has been harmed by the PUC's decision denying recovery of its TOP costs under § 1307(f).

With respect to the merits of this appeal, the pivotal question here involves the classification of TOP costs. NFG argues that TOPs are natural gas costs that are billed to NFG as a natural gas distributor by its gas supplier, and which may be recovered through a § 1307(f) filing. The PUC asserts that TOPs are attributable to acquisition costs and therefore should be classified as production-related costs that properly should be allocated to a pipeline's commodity rate, the adjustment of which the PUC must address in a base rate proceeding under § 1308.

Before addressing the issues raised in this appeal, a discussion of TOP costs is warranted. The court of appeals for the fifth circuit summarized take-or-pay costs in *Diamond Shamrock Exploration Corp. v. Hodel*, 853 F.2d 1159, 1164 (5th Cir.1988):

> Natural gas sales contracts usually contain a standard "take-or-pay" clause. This clause requires the pipeline-purchaser either to take (and pay for at the maximum lawful price) a specified quantity of natural gas during each contract year or to make a single annual payment to the producer to the extent that the volumes of gas taken during any contract year fall short of the minimum annual contract quantity. During a contract year, the producer receives monthly payments only for the gas actually taken.

At the end of the contract year, volumes of natural gas production actually taken are compared with the minimum contract volume. In the event the pipeline has actually taken less than the contract volume, the pipeline must then make an annual lump-sum payment, the take-or-pay payment, representing the difference between the minimum contract volume for that year and the actual volume taken. Because natural gas is almost always transported by pipeline and cannot be "stored" at the lease site, if a pipeline cannot accept delivery of gas, the producer must shut in his wells or restrict production. There can be no gas produced at the time a take-or-pay payment is made because the producer has to leave in the ground reserves sufficient to meet make-up demands over the make-up period, generally five-to-seven years. The committed volume under the gas sales contract must remain in the reservoir for the remainder of the make-up period.

. . . .

Over the next seven years, the pipeline has the right to credit excess gas taken against a previous take-or-pay payment. Whenever the pipeline purchases gas in excess of the contract volume for a subsequent year, that excess gas purchase is credited against the earlier deficiency. This excess gas is referred to as make-up gas. At the end of a year in which make-up gas is taken, the pipeline will receive a single lump-sum refund, or credit, of prior take-or-pay payments made for the earlier deficiency to the extent to which the deficiency has now been made up. The refund is calculated on the basis of the price of gas during the month in which the make-up gas was actually taken.

Although the price paid for these make-up gas deliveries is the price in effect at the time the make-up gas is produced and taken, the payment is made by applying the purchaser's prior take-or-pay payments as a credit towards the purchase price of the make-up gas. While some contracts allow the producer to retain take-or-pay

payments that have not been recouped by the expiration of the make-up period, others require the producer to refund any unrecouped payments to the purchaser.

The interstate pipeline suppliers in turn pass on their TOP costs to their local gas distributor customers, under rates approved by FERC.

### 2. The effect of the base rate case on this appeal

The issues the PUC and the OCA raise, challenging NFG's appeal, center on their contention that the relief provided through NFG's base rate proceeding under § 1308 is substantially the same as the relief NFG seeks in its appeal of the commission's denial of TOP costs under § 1307(f). The relevant language of the latter provision reads as follows:

§ 1307(a) **Sliding scale of rates; adjustments**

**(a) General rule.**—Any public utility, except ... natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000 with respect to the gas costs of such natural gas distributors, may establish as sliding scale of rates or such other method for the auto-matic adjustment of the rates of the public utility as shall provide a just and reasonable return on the rate base of such public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return.

. . . .

**(f) Recovery of natural gas costs.**—

(1) Natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000 may file tariffs reflecting increases or decreases in their natural gas costs and the tariffs shall have an effective date six months from the date of filing.

. . . .

(3) Within 60 days following the end of such 12–month period as the commission shall designate, each public utility subject to this subsection shall file with the com-mission a statement which specifies for such period:

(i) The total revenues received pursuant to this section.

(ii) The total gas expense incurred.

(iii) The difference between the amounts specified by subparagraphs (i) and (ii).

(iv) Evidence explaining how actual costs incurred differ from the costs allowed under paragraph (2) and why such differences occurred.

(v) How these costs are consistent with a least cost procurement policy as required by section 1318 (relating to determination of just and reasonable natural gas rates).

## a. Collateral attack

First, the PUC contends that NFG's pursuit of this appeal constitutes a collateral attack on the PUC's order in the base rate proceeding because the commission's order in that proceeding refused to allow NFG a reconciliation of costs similar to that provided in § 1307(f), which NFG here seeks to obtain. The commission points out that collateral attacks on agency decisions are not permitted. *Baltimore and Ohio Railroad Co. v. Pennsylvania Public Utility Commission*, 77 Pa. Commonwealth Ct. 381, 465 A.2d 1326 (1983). The PUC argues that even if NFG does not recover all of its TOP costs through the relief granted in the base rate proceeding, it could seek to recover or true-up its unrecovered costs in a later base rate proceeding.

However, we agree with NFG that, although the PUC granted recovery of TOP costs known at the time of its base rate decision, it denied NFG a means to reconcile, or true-up, actual costs that are reflected in the volumes ultimately delivered to NFG's customers. Hence, if the commission erred in its interpretation of § 1307(f) in denying reconciliation for TOP costs under that section, NFG then would be denied the benefit of the automatic reconciliation provision of § 1307(f). Although the commission granted NFG recovery of all its TOP costs, except those projected TOP costs which NFG, at the time it filed its tariffs, only anticipated one of its pipelines will pass through, the commission's discretionary power to determine the reasonable-

ness of rates under § 1308 could result in recovery of less than NFG's ultimate actual TOP costs. In fact, the commission admitted in its policy statement that an LDC could under- or over-recover TOP costs in a § 1308 proceeding.

Significantly, the reconciliation feature of § 1307(f) provides a quicker and more responsive means than a base rate proceeding by which a utility's charges to customers may reflect increases or decreases in the cost of natural gas.

Furthermore, NFG asserts that the reason it included TOP costs in its subsequent base rate tariff was because of the commission's proposed policy statement issued on July 21, 1988. Hence, NFG sought recovery under § 1307(f), because of its belief that § 1307(f) is the appropriate method by which to recover TOP costs, but also took the precautionary route of seeking to recover TOP costs in its base rate proceeding, in accordance with the commission's policy statement. NFG could not challenge the commission's adopted policy until the commission rejected NFG's application for recovery under § 1307(f).

The commission also contends that NFG was not precluded from pursuing its request for a reconciliation mechanism in the base rate proceeding. Of course, because the commission specifically denied NFG's proposed reconciliation methods in that proceeding, NFG could have pursued an appeal of the commission's denial of NFG's proposed reconciliation under § 1308. However, because § 1307(f), if applicable to TOP costs, provides for automatic reconciliation, NFG is entitled to pursue that alternative and possibly absolute route, rather than appeal the commission's denial of reconciliation under § 1308.

### b.  Issue preclusion

█ Collateral estoppel will preclude review of an issue when (1) an issue decided in a previous adjudication is identical to the issue presented in the present controversy; (2) there was a final judgment on the merits; (3) the party against whom the estoppel claim is made was a party, or was in privity with a party to the previous adjudication; and

(4) the party had a full and fair opportunity to litigate the issue in the previous action. *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission*, 128 Pa. Commonwealth Ct. 259, 563 A.2d 548 (1989).

■ In this case, because NFG did not obtain the relief it sought in the base rate proceeding—a method to reconcile *actual* TOP costs—and because the ultimate resolution of the issues presented in this appeal could provide NFG with an outcome not available in the base rate proceeding—reconciliation through § 1307(f)—our conclusion is that collateral estoppel is not applicable here.

The PUC claims that the costs at issue here are the same that were at issue in the base rate proceeding. However, the fact that the costs which are at issue are TOP costs does not mean that the issues resolved are identical. Contrary to the PUC's position, the question of whether TOP costs are natural gas costs, an issue which can be disputed properly only in the context of the § 1307(f) proceeding, was not resolved in the base rate proceeding.

The commission did consider the question of whether the federal government intended to preempt the states' right to determine the method by which LDCs may recover TOP costs in the base rate proceeding. However, the question of whether the General Assembly intended LDCs to recover TOP costs through § 1307(f) was not properly before the commission. Contrary to the commission's position, although § 1307(f) states that an LDC *may* recover natural gas costs through a § 1307(f) proceeding, thus providing LDCs with the option of pursuing rate adjustments through either § 1307 or § 1308, that language does not also mean that the commission has the discretion to deny recovery under § 1307(f), where a party seeks to recover natural gas costs through that provision.

### c. Mootness

■ The commission also argues that this appeal is moot because the commission allowed recovery of NFG's known

TOP costs in the base rate proceeding. The commission contends that its grant in the base rate proceeding of the opportunity for NFG to recover 100% of known TOP costs renders this appeal moot because no controversy now exists. However, as NFG points out, the use of the base rate method of recovery may result in under-recovery of TOP costs. The ultimate costs recovered under the respective sections of the code here involved are not necessarily the same, because the reconciliation provision under § 1307(f) is mandatory, not discretionary. The reconciliation provision contained in § 1307(f), when applicable, inures a clear and mandatory benefit to utilities. Assuming that TOP costs are natural gas costs, recovery under § 1307(f) may not prove to be the equivalent of recovery under § 1308, because the PUC conceivably could deny full recovery of the projected TOP costs NFG sought to recover in that proceeding.

### d. Appealable order

■ The commission argues that the order from which NFG now appeals is not a final, appealable order because the order indicates that NFG incorrectly filed for the recovery of TOP costs under § 1307(f) rather than under § 1308, and thus that NFG had another method, namely § 1308, of obtaining the relief it seeks through § 1307(f). Although, as discussed above, the commission's order in the base rate decision provides for recovery of NFG's known TOP costs, that remedy is not the equivalent of the reconciliation *guaranteed* for actual natural gas costs in § 1307(f). Hence, we perceive the order as final and appealable.

### e. Necessary harm

■ Finally, the OCA contends that we should dismiss the appeal because NFG has not established that it will suffer any harm as a result of the commission's order, because it is impossible at this time to determine whether NFG has been unable to recover any of its proven TOP costs or whether it has or will over-recover its TOP costs.

However, the fact that a gas distributor ultimately may over- or under-recover TOP costs demonstrates the importance of the reconciliation feature of § 1307(f). If this court were to dismiss the appeal and NFG ultimately under-recovers a portion of its actual TOP costs, NFG will have been precluded from obtaining the timely and automatic benefit of the reconciliation provided under § 1307(f); NFG will be required to pursue the more time-consuming and uncertain route of recovery under § 1308.

### 3. Recovery of TOP costs under 66 Pa.C.S. § 1307(f)

The pivotal question is whether the commission has interpreted § 1307(f) correctly in determining that TOP costs are not natural gas costs for the purpose of recovery under that section.

NFG argues that the General Assembly intended § 1307(f) to provide a means by which LDCs could recover all costs incurred in *obtaining* gas supplies, including TOP costs. NFG contends that the PUC has exceeded its authority by limiting the costs an LDC may recover under § 1307(f), and by excluding TOP costs, because the Public Utility Code does not give the commission the discretion to deny an LDC the right to pursue recovery of natural gas costs under § 1307(f).

The dispute as to the proper characterization of TOP costs centers on whether those costs should be viewed as a cost of gas, or as a cost associated with the failure of a gas pipeline (and ultimately an LDC) to take gas for which it is contractually obligated to "take-or-pay", or, even if TOP costs are viewed as a cost associated with the *failure* to take quantities of gas, whether such a cost nevertheless can be regarded as a natural gas cost for the purpose of § 1307(f).

Both the commission and the OCA rely on FERC decisions and the decision of the Court of Appeals in *Hodel* as support for the commission's decision denying recovery of TOP costs under § 1307(f). NFG asserts that the PUC's and OCA's reliance on these sources is misplaced because

FERC decisions and the *Hodel* decision involved only TOP costs incurred by pipelines subject to FERC jurisdiction, and therefore are not applicable to LDCs subject to state rate-making regulation. NFG also notes that FERC, although deeming TOP costs to be non-purchase gas costs, has diluted that policy by permitting first and second tier pipelines to pass through TOP costs to their customers on an as-billed basis, similar to the true-up recovery available under § 1307(f).

■ Of course, although FERC has authority to regulate pipelines, federal courts have concluded that federal law has not preempted the states' power to regulate the recovery of costs arising from FERC proceedings. *Arkansas Power and Light Co. v. Missouri Public Service Commission*, 829 F.2d 1444 (8th Cir.1987). Because FERC has left the states with the power to determine how LDCs may recover TOP costs, our examination must focus on the language of § 1307(f) and on the commission's regulatory authority under the Public Utility Code.

■ NFG argues that the 1984 amendments to the Public Utility Code were intended to create a comprehensive procedural and substantive framework for the recovery of all pipeline charges. NFG argues that the legislature's adoption of the "least cost fuel procurement policy" set out in § 1318 of the Code, 66 Pa.C.S. § 1318, supports its position that the legislature intended LDCs to recover TOP costs in a § 1307(f) proceeding. NFG also points to § 1317, 66 Pa.C.S. § 1317, which requires LDCs to supply the commission with information regarding their participation in FERC proceedings that affect a utility's gas costs.

The two provisions read in pertinent part:

§ 1317. **Regulation of natural gas costs**

(a) **General rule.**—In every rate proceeding instituted by a natural gas distribution utility, pursuant to section 1307(f) ... each such utility shall be required to provide the commission such information ... that will permit the commission to make specific findings as to whether the

utility is pursuing a least cost fuel procurement policy, consistent with the utility's obligation to provide safe, adequate and reliable service to its customers. Such information shall include ... statements regarding:

(1) The utility's participation in rate proceedings before [FERC] which affect the utility's gas costs.

(2) The utility's efforts to negotiate favorable contracts with gas suppliers and to re-negotiate existing contracts with gas suppliers or take legal actions necessary to relieve the utility from existing contract terms which are or may be adverse to the interests of the utility's ratepayers.

### § 1318. Determination of just and reasonable gas rates

**(a) General rule.**—In establishing just and reasonable rates for those natural gas distribution companies with gross intrastate operating revenues in excess of $40,000,-000 under section 1307(f) or 1308(d) ... the commission shall consider the materials provided by the utilities pursuant to section 1317. No rates for a natural gas distribution utility shall be deemed just and reasonable unless the commission finds that the utility is pursuing a least cost fuel procurement policy, consistent with the utility's obligation to provide sage, adequate and reliable service to its customers. In making such a determination, the commission shall be required to make specific findings which shall include ...:

(1) The utility has fully and vigorously represented the interests of its ratepayers in proceedings before [FERC].

(2) The utility has taken all prudent steps necessary to negotiate favorable supply contracts and to relieve the utility from terms in existing contracts with gas suppliers which are or may be adverse to the interests of the utility's ratepayers.

Several points are clear from a review of these provisions. First, both provisions require the commission to consider two factors, (1) a utility's representation in FERC proceed-

ings and (2) a utility's efforts in negotiating and renegotiating contracts that are or may be adverse to the utility's ratepayers. That broad language clearly could encompass contracts for gas that pass-through a pipeline's TOP costs to the utility. Also, § 1318 directs the commission to consider an LDCs compliance with § 1317 in both § 1307(f) and § 1308 proceedings. Hence, reading §§ 1317 and 1318 does not support NFG's argument that the legislature intended LDCs to recover TOP costs under § 1307(f), because §§ 1317 and 1318 clearly encompass § 1308 as well as § 1307(f).

The broad reference to contracts in §§ 1317 and 1318 could lead to the conclusion that the legislature intended TOP costs to be recovered as natural gas costs under § 1307(f). Nevertheless, § 1307(f) does not expressly refer to TOP costs as natural gas costs that may be recovered under that section, nor does the language of §§ 1317 and 1318 express the legislative intent that TOP costs constitute a natural gas cost that an LDC may recover under § 1307(f).

Clearly, TOP costs in a very real sense relate to the ultimate cost of gas. As NFG notes, and as Public Utility Commissioner Frank Fischl indicated in his dissent to the commission's adopted TOP policy:

"[t]he natural gas crises of the mid and late 1970's resulted in the initial take-or-pay contracts between the pipelines and the producers. Schools were closed and industry in Pennsylvania was curtailing manufacturing. Loosening gas supply, cheaper spot market gas, increased transportation service and interruptible service led to least cost gas supplies *all of which* have led to take-or-pay expenses ... Savings from the restructuring of the gas industry are estimated to be five times take-or-pay expenses. The savings for the average residential customer, over the last five years, is ten dollars per month. Estimates of the take-or-pay expenses are two dollars per month."

NFG notes that take-or-pay costs began to rise in the 1980s, because FERC orders and state policy encouraged the acquisition of local gas, and altered the rights of pipelines with respect to take-or-pay credit for gas volumes released and transported.

None of the parties dispute the fact that take-or-pay costs have a real effect on the ultimate cost of gas to the consumer. In seeking to fulfill its statutory duty to provide adequate service to customers, LDCs necessarily have to purchase gas from pipelines that pass on to the LDCs the TOP costs they incur in their contracts with upstream pipelines and producers. Thus, TOP costs do constitute a cost of providing service.

■ Nevertheless, with respect to the language of § 1307(f), this court's conclusion is that the commission correctly interpreted the provision. As discussed above, the statutory language of the relevant provisions does not express a clear legislative intent that TOP costs are natural gas costs. When statutory language is not explicit, a court may defer to an administrative agency's interpretation in order to ascertain legislative intent. *Carol Lines, Inc. v. Pennsylvania Public Utility Commission*, 83 Pa.Commonwealth Ct. 393, 477 A.2d 601 (1984).

Certainly, with respect to TOP costs, if sales of gas reach anticipated levels, and pipelines purchase the volumes for which they contract, there would be no question as to whether the cost of purchasing that gas could be reconciled under § 1307(f).

However, we agree with the commission's interpretation that, although TOP costs are incurred as a cost of *obtaining* gas, they are nevertheless not a cost of the gas ultimately purchased for LDC customers. The fact that those costs are associated with the failure of a pipeline to purchase gas removes those costs from the scope of § 1307.

Accordingly, the decision of the Public Utility Commission is affirmed.

638

## ORDER

Now, February 14, 1991, the decision of the Public Utility Commission, dated July 28, 1989, at No. R–881125, is affirmed.