NATIONAL FUEL GAS DISTRIBUTION
CORPORATION, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 15, 1996.
Decided May 23, 1996.
Reargument Denied July 10, 1996.

John H. Isom, for Petitioner.

John A. Levin, Assistant Counsel, for Respondent.

Edmund J. Berger, Assistant Consumer Advocate, for Intervenor, Office of Consumer Advocate.

Before DOYLE and McGINLEY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

National Fuel Gas Distribution Corporation (National) is a New York corporation wholly-owned by National Fuel Gas Company, a public utility holding company. National furnishes gas sales and transportation service to the public in northwestern Pennsylvania and western New York. Within Pennsylvania, National distributes locally to Armstrong, Butler, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Forest, Jefferson, McKean, Mercer, Venango and Warren counties.

On March 8, 1994, National filed Supplement No. 39 to Tariff Gas–Pa. P.U.C. No. 8 with the Public Utility Commission (PUC), to become effective May 7, 1994. This filing contained proposed changes in rates, rules and regulations calculated to produce $15,960,000 in additional annual revenue. The filing was suspended by operation of law until December 7, 1994,[1] while the PUC instituted an investigation into the lawfulness, justness and reasonableness of the proposed increase.

Formal complaints against the proposed increase were filed by the Office of Consumer Advocate (Consumer Advocate), the Office of Small Business Advocate (Small Business

---

1. This suspension was pursuant to Section 1308(d) of the Public Utility Code (Code), Act of July 1, 1978, P.L. 598, *as amended,* 66 Pa.C.S. § 1308(d).

Advocate), the Hospital Council of Western Pennsylvania, Kenneth C. Springirth and several other National customers. The Independent Oil and Gas Association of Pennsylvania was permitted to intervene. The PUC's Office of Trial Staff (OTS) was directed to participate and filed a notice of appearance.

After nine technical evidentiary hearings and two public hearings, Administrative Law Judge (ALJ), George M. Kashi, issued a Recommended Decision advising that National be granted an operating revenue increase not to exceed $2,261,000. Exceptions were filed to the Recommended Decision, and on December 1, 1994, the PUC adopted an opinion and order allowing a revenue increase of $4,754,000. It is from this order and opinion that National appeals.

■ Our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Moreover, the burden of proof in a rate case is upon the public utility to show that the rate involved is just and reasonable. 66 Pa.C.S. § 315.

## I. Weather Normalization

■ National first argues that the PUC's decision to reject its proposal to adopt a ten-year period of degree day data to normalize the effects of temperature variation on the volume of gas sold and transported is not supported by substantial evidence.National claims that the PUC disregarded this Court's admonition in *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 47 Pa.Cmwlth. 512, 409 A.2d 446 (1979), to periodically reassess the reasonableness of its approach to weather normalization. National argues that, while it has provided just such a reassessment, showing through scientific data that a ten-year period has greater predictive capability in ratemaking, the PUC has chosen to cling to an old habit, despite a complete absence of scientific or statistical support, for the use of thirty years of data.

The PUC held, after analyzing the conflicting evidence put forward by National, the Consumer Advocate, the OTS, and the Small Business Advocate, that National had not met its burden to prove that the use of a ten-year period was just and reasonable, and had not provided sufficient support for its proposal to abandon the recognized standard of thirty years of data in favor of a ten-year period. We hold that there is substantial evidence to support this determination.

National's argument rests on three scientific studies, about which the parties opposing this change raised serious questions regarding their reliability and relevance. For instance, while one of the articles cited by National concludes that thirty years of data is not optimum for predicting weather for the next few years, that same study is equivocal as to the preferable period to use in determining a normal. In this regard, one of the expert witnesses presented by the Small Business Advocate stated that there is evidence which is just as strong, if not stronger, to support the position that a period greater than thirty years should be used to develop a normal degree-day value, rather than the shorter ten-year period proposed by National. Moreover, the study commissioned by National of temperatures in the Erie area was criticized for its lack of scientific rigor, while the relevancy of another of the articles cited by National was in doubt because it did not assess climatic normals in National's service area, and there was reason to believe that these normals were inapplicable in Pennsylvania. There was also expert testimony that National used incorrect data and incorrect computational procedures in developing its degree-day forecast and the resulting revenue adjustment.

Therefore, contrary to National's contentions, there is substantial, if not abundant, record evidence to support the PUC's conclusion that National had failed to carry its burden to prove that its calculation of revenues based on a ten-year weather normalization period, as opposed to the more widely used thirty-year period, was just and reasonable. Substantial evidence has been defined as, "that quantum of evidence which reasonable minds might accept as adequate to sup-

port a conclusion." *Norfolk & Western Railway Co. v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 127, 413 A.2d 1037, 1046 (1980). Under this definition there was clearly substantial evidence to support the PUC's decision, and we therefore affirm the PUC on this matter.

## II. Advertising Expenses

Next, National argues that the PUC erred in disallowing a substantial portion of its advertising expenses devoted to: (1) dealer cooperation appliance advertising; (2) advertising directed toward builders; and (3) advertising related to a financing program for the purchase of gas appliances and equipment. Section 1316 of the Code, 66 Pa.C.S. § 1316, provides in pertinent part that the PUC will disallow as operating expenses expenditures for advertising:

> Unless and only to the extent that the commission finds that such advertising *is reasonable and* meets one or more of the following criteria:
>
> (1) Is required by law or regulation.
>
> (2) Is in support of the issuance, marketing or acquisition of securities or other forms of financing.
>
> (3) Encourages energy independence by promoting the wise development and use of domestic sources of coal, oil or natural gas. . . .
>
> (4) Provides important information to the public regarding safety, rate changes, means of reducing usage or bills, load management or energy conservation.
>
> (5) Provides a direct benefit to ratepayers.
>
> (6) Is for the promotion of community service or economic development.

(Emphasis added.)

■ National first maintains that its uncontested that its advertising program has remained substantially the same from year to year. Therefore, because the PUC has held in three recent rate cases in which National's advertising was challenged that its advertising met the criteria for recovery under Sections 1316(a)(4) and 1316(a)(5) of the Code, it was error for the PUC in this case to abandon, without explanation, a substantial body of its own precedent and deny recovery for advertising which was earlier held to promote conservation and/or directly benefit the ratepayers.

The PUC, after a lengthy exposition summarizing the parties' arguments, states: "we found the Company's argument that its advertisement regarding the efficiency of natural gas vis-a-vis other energy sources is beneficial to the ratepayer, to be unconvincing. We found, in fact, that the Company's advertising is in essence targeted to seek and retain load."

This is the extent of the PUC's reasoning on this issue, which fails to address the question of why recovery was denied in this rate proceeding and not in earlier proceedings when the advertising essentially remained the same. It may be that, as the Consumer Advocate and OTS argue, beginning in 1990, in *Pennsylvania Public Utility Commission v. Equitable Gas Co.,* 73 Pa. PUC 301 (1990), the PUC's policy on this issue was undergoing change. The PUC began to more closely evaluate the reasonableness of claimed advertising expenses under Section 1316 of the Code, requiring that the public utility show that promotional materials directly benefit the ratepayer, or that the advertising directly encouraged energy independence or conservation. However, here, for lack of specific findings, we do not know if the PUC evaluated National's advertising, (copies of which were made part of this lengthy record), and determined that it was not reasonably and directly designed to promote conservation, as in *Equitable,* or whether there were other reasons or facts dispositive of the outcome. We also do not know why the PUC believes that advertising targeted to seek and retain load is necessarily inconsistent with the intent to promote conservation and energy independence.

As in *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 47 Pa. Cmwlth. 512, 409 A.2d 446, 453 (1979), "[w]e simply cannot tell as a matter of law whether the PUC abused its discretion or not," and therefore, we must remand with the requirement that the PUC set forth its reasoning because "we are frustrated in the performance of our judicial review." *Id.*

### III. Inflation Expense

█ Next, National argues that it was error for the PUC to disallow its inflation expense which is a separate adjustment of 2.58% to seventeen cost elements that are not otherwise adjusted. Again, as in the above discussion of advertising expenses, the PUC opinion contains a lengthy summary of the parties' and the ALJ's arguments, and then concludes:

> Based upon our consideration of the positions of the parties, we do not find that the arguments contained in the Company's [National's] Exception rise to a level that would cause us to reverse the ALJ's resolution of this issue. We agree that the Company's adjustment is unsubstantiated. Based upon the foregoing discussion, we will deny the Company's Exception regarding this issue. (PUC Opinion at 95.)

This is the extent of the PUC's analysis. The PUC fails to indicate which arguments it found persuasive, or why it rejected National's evidence that each category of expense, to which the inflation adjustment was applied, actually increased during the five-year period prior to the test year at an overall rate that exceeded the proposed inflation adjustment rate. We are left completely in the dark as to whether the PUC based its decision to reject this evidence on OTS' argument that there was too much variation from year to year in the individual categories of expenses to which the inflation adjustment is applied, e.g., a decrease in advertising expenses in 1989 of 16.8%, to an increase in 1990 of 35.6%, to assume that there is any predictable march of inflation for which a blanket inflation factor should compensate.

Moreover, if we assume the PUC has accepted the OTS' argument, still, PUC decisional law reflects its consistent acceptance of the application of an inflation factor to expenses which are not otherwise adjusted, and has not indicated that there are any inherent flaws in this adjustment procedure. In fact, in *Pennsylvania Public Utility Commission v. Pennsylvania–American Water Co.*, 71 Pa. PUC 210 (1989), a case the Consumer Advocate and the ALJ cite to urge rejection of the inflation adjustment here, the PUC permitted the usual inflation adjust-

ment, while rejecting the company's proposal for deviating from the normal procedure of calculating that figure.

Moreover, the PUC has specifically refused to require that a company perform a definitive study of the relationship between the specific items adjusted and the price factors employed. *Pennsylvania Public Utility Commission v. Pennsylvania–American Water Co.*, 68 Pa. PUC 343 (1988). Therefore, if the PUC is going to require substantiation of the adjustment, it has an obligation to provide explicit standards for such substantiation and explain its divergence from earlier decisional law. We have stated:

> While an administrative agency is not bound by the rule of *stare decisis*, [citation omitted], an agency does have the obligation to render consistent opinions, and should either follow, distinguish or overrule its own precedent. [Citation omitted.]

*Standard Fire Insurance Co. v. Insurance Department*, 148 Pa.Cmwlth. 350, 611 A.2d 356, 359 (1992).

Here, the PUC has failed to set forth its reasoning for rejecting the inflation adjustment, and while it may have good reasons for doing so, we are unable to tell whether these reasons are valid as a matter of law or an abuse of discretion. Once again, we must remand this issue to the PUC for a statement of their reasons for departing from earlier precedent, and for findings regarding the relevant evidence.

### IV. Interest on TOP Cost Refunds

Finally, National argues that the PUC erred in directing it to pass on to ratepayers the interest payments made by pipeline suppliers in connection with refunds of take-or-pay (TOP) costs. Some general background on TOP costs and the recovery of such costs from the ratepayer is required to understand the questions at issue here.

█ Generally speaking, TOP costs are charges that interstate pipeline suppliers impose upon local gas distributors (LDCs), such as National, under cost recovery procedures and regulations established by the Federal Energy Regulatory Commission

(FERC). *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 137 Pa.Cmwlth. 621, 587 A.2d 54 (1991). Interstate pipeline suppliers initially incurred these TOP costs in the wake of the natural gas shortages of the mid and late 1970's. In order to assure the supply of natural gas to their areas, these interstate suppliers entered into long term contracts with the producers on terms which contractually obligated them to "take or pay" for specific quantities of gas at specific, usually high, prices. TOP costs are thus payments for the failure to take contractually determined quantities of gas. *Id.*

In the mid 1980's, FERC began restructuring the natural gas industry, providing for more competition within the industry by allowing the creation of new and cheaper sources of natural gas for the LDCs. LDCs using these new sources bypassed the big interstate pipelines, and as more LDCs reduced demand on these pipelines subject to TOP contracts, TOP costs began to rise, first to the interstate pipelines and then to the LDCs.

In 1989, the PUC issued a statement of policy regarding recovery of TOP expenses incurred by the LDCs. This statement, codified at 52 Pa.Code § 69.181, provides that such expenses should be shared by all segments of the industry, including producers, pipelines, LDCs and their customers, and to accomplish this balancing of liability, the regulations provide two options with respect to recovery of TOP expenses by LDCs. The first option is that if an LDC elects to absorb what the PUC considered to be a reasonable portion of TOP costs, then in exchange the non-absorbed costs would be recoverable through Section 1307(a) of the Code, 66 Pa. C.S. § 1307(a). A Section 1307(a) proceeding provides for full reconciliation of the non-absorbed costs to recoveries.

In contrast, the second option provides that if the LDC elects not to absorb a reasonable portion of the TOP costs, then these expenses can only be claimed under Section 1308 of the Code, in a rate case, subject to the customary tests and requirements for non-recurring expenses. 52 Pa.Code § 69.181(j) specifically states that the pru-

dence of the incurrence of the TOP costs, the appropriate allocation of take-or-pay costs to various customer classes, as well as the application of other customary ratemaking principles, including the requirement that the company prove that the expense involved is just and reasonable, will be considered in the proceeding.

Moreover, while companies which shoulder some of the costs are permitted to annually reconcile or "true up" their actual TOP expenses, those companies which choose the other option are required to recover their expenses on a total "through put" basis, amortized over a period set by the PUC. In concrete regulatory practice, a public utility pursuing recovery of non-recurring, operational expenses, pursuant to Section 1308 of the Code, is entitled to recovery of its expenses through the "through put" method of calculating normalized expenses projected by the utility with reference to a "test year" which is both future and hypothetical. *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 93 Pa.Cmwlth. 410, 502 A.2d 722 (1985). The use of prospective ratemaking means that, in choosing the second option, a company, in return for not having to absorb a portion of the TOP costs, accepts the risk of under or over recovery based upon its ability to project its future sales levels.

On April 3, 1989, National filed a rate case under Section 1308 of the Code claiming a pass through of 100% of its TOP expenses ($35,846,333) plus interest ($5,200,000). The ALJ issued an order and opinion which was subsequently appealed to the PUC. *Pennsylvania Public Utility Commission v. National Fuel Gas Distribution Corp.,* 72 Pa. PUC 1 (1989) (1989 rate case).

In this opinion, the PUC determined that the actual TOP amount should be adjusted downward to reflect "bridge-gas" transportation credit received by the company, as well as $4 million in speculative and unsubstantiated costs which derive from National's attempt to recover TOP costs which were at that time subject to litigation, and settlements reached with the pipelines amounting to $1,752,100. Moreover, the amortization

period for recovery of TOP costs was set at five years.

On the basis of established ratemaking principles, the PUC disallowed recovery of interest over the entire amortization period.[2] *Butler Township Water Co. v. Pennsylvania Public Utility Commission,* 81 Pa.Cmwlth. 40, 473 A.2d 219 (1984). Moreover, the PUC denied National's proposal to "true up" or reconcile TOP costs annually using a Section 1307(a) mechanism, on the basis that this allowed a utility to pick and choose the most beneficial aspects of the recovery under Section 1307(a) of the Code, while pursuing 100% recovery under Section 1308. The PUC reasoned that such an approach would dismember the careful balancing of risks and benefits developed by the PUC in 52 Pa.Code § 69.181 for recovery of TOP costs.

In the proceeding before the PUC in the instant case, National sought to retain the interest on TOP refunds from CNG Transmission Corporation and Columbia Gas Transmission Corporation, amounting to approximately $600,000, rather than flowing that interest back to the ratepayers. Here, the PUC rejected National's proposal and directed National to include the interest payments as a reduction to its cost of service.

■ National argues that the PUC failed to consider the facts of record that demonstrated that the principle amounts refunded by the pipelines were costs paid by National's shareholders. It claims that, despite adjustments to the unamortized balance of TOP costs and extension of the amortization period in each of National's base-rate proceedings subsequent to the 1989 proceeding, National still will not recover almost $3 million in TOP costs. Consequently, at all times, National paid more to the pipelines than it has recovered from the ratepayers, and therefore it should receive compensation for the use of shareholders' funds. National argues that, instead of basing its decision on this uncontested evidence of record, the PUC improperly relied on its interpretation of the policy statement, as codified at 52 Pa.Code § 69.181, which is not a binding regulation or precedent.[3]

■ While we do not agree with the Consumer Advocate that National is barred by the doctrine of collateral estoppel from pursuing this claim for interest on refunded payments,[4] we do agree that National has not demonstrated that ratepayers did not bear some, or all, of the costs of these particular TOP expenses. The Consumer Advocate properly points out that its witness testified that there has been no analysis or quantification by National of the time value of the money lost to ratepayers, that is the lag between the times that ratepayers made payments to National for TOP costs, and the time the ratepayers receive a refund. Therefore, National has failed to carry its burden to prove its equitable argument that it, and not the ratepayers, is entitled to a refund.

2. The PUC only allowed National to recover interest from October 21, 1988 to November 3, 1989, in recognition that this constituted the period of delay attributable to the PUC while it developed its policy for TOP cost recovery.

3. National relies on *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671 (1977), where the Pennsylvania Supreme Court explained the differences between regulations and policy statements. *Norristown* held that while an agency may not apply its statement of policy as a binding regulation having the force of law, it is permitted to use the policy as a guideline in case-by-case adjudications. Moreover, the *Norristown* court held that when an agency applies a policy statement, as opposed to a properly adopted substantive rule, it must be prepared to support the policy just as if the policy statement had never been issued. Here, the PUC proceeded by way of adjudication, consistent with its general statement of policy, and, in accordance with *Norristown,* it responded to National's challenge to its policy of denying recovery of interest by reference to its goal of encouraging companies to absorb some of the TOP costs to provide an equitable sharing of refunds. Thus, the PUC did not improperly use its policy statement to justify its decision on this issue.

4. Collateral estoppel applies if, among other things, there is an identity in the thing sued for in the prior case. *Carroll Township Authority v. Municipal Authority of the City of Monongahela,* 145 Pa.Cmwlth. 273, 603 A.2d 243 (1992). In the 1989 rate case, the issue was whether National could recover interest on its TOP payments from the ratepayer, while here the issue is whether the interest received by National from the pipelines could be retained. Although the issues are similar, they are not identical, and therefore collateral estoppel does not apply.

Moreover, in choosing to recover 100% of its TOP expenses, National, in accordance with the PUC statement of policy at 52 Pa. Code § 69.181, also chose to pursue recovery of TOP costs by reference to its projected future test year. Thus, any shortfall it experienced may be due to its failure to predict future sales levels. National is in effect proposing to pay itself the interest on TOP costs, by retaining the interest on TOP payments refunded by the pipelines. Ratepayers were obligated to pay the full amount of the pipeline TOP costs passed through by National, and the refunds from these costs are clearly associated with the payment of these costs. The only costs that National has had to bear, which differ from the costs borne by the ratepayer, are those carrying costs associated with amortization of this expense in rates.

■ As stated above, it is clearly established in our case law and in PUC policy that a utility may not recover the carrying costs associated with the amortization of an operating expense. Not only would this allow a utility to capitalize an item in its rate base and at the same time recover an item as expense from ratepayers, *Butler Township Water Co.*, but it would also undermine the PUC's policy, as codified at 52 Pa.Code § 69.181, to balance the interest of shareholders and ratepayers, and to fairly spread the cost of TOP expenses which arose out of National's failure to purchase gas at its full contract requirements level.

Thus, in its decision not to absorb any of the TOP costs, National decided to forego the recovery of carrying costs, either directly as interest on the amount passed on to ratepayers, or indirectly through retaining interest payments on refunds, and therefore it is not entitled to retain the interest on the TOP costs refunded by the pipelines.

Accordingly, we affirm the order of the PUC as regards issue I, weather normalization, and issue IV, interest on TOP cost refunds. We vacate and remand as regards issue II, advertising expenses, and issue III, inflation expense, with instructions to the PUC to make findings of fact and statements of reasons to support its disposition of these two issues in conformance with the foregoing opinion.

## ORDER

AND NOW, this 23rd day of May, 1996, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby affirmed as regards to issues I and IV and the case is remanded on issues II and III for findings of fact and statements of reasons to support its disposition of the latter two issues. The Public Utility Commission may, but need not, receive additional evidence and upon adopting such proper findings and statements of reason, shall revise and modify its final order as to such matters and to such extent, if any, as may be made necessary by its reconsideration.

Jurisdiction relinquished.