**MET–ED INDUSTRIAL USERS GROUP and Penelec Industrial Customer Alliance, Petitioners**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent**

**Metropolitan Edison Company and Pennsylvania Electric Company, Petitioners**

**v.**

**Pennsylvania Public Utility Commission, Respondent**

**Irvin A. Popowsky, Consumer Advocate, Petitioner**

**v.**

**Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided Nov. 7, 2008.

Charis Mincavage, Harrisburg, for petitioners.

Lawrence F. Barth, Asst. Counsel, Harrisburg, for respondent.

John F. Povilaitis, Harrisburg, for Intervenor, Pennsylvania Electric Company.

Linda Richardson Evers, Reading, for Intervenor, Metropolitan Edison Company.

Daniel G. Asmus and Lauren M. Lepkoski, Harrisburg, for Intervenor, Office of Small Business Advocate.

Joel H. Cheskis and Aron J. Beatty, Harrisburg, for Intervenor, Office of Consumer Advocate.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge FRIEDMAN.

Met–Ed Industrial Users Group and Penelec Industrial Customer Alliance (together, Customers), Metropolitan Edison Company and Pennsylvania Electric Company (together, Utilities) and Irvin A. Popowsky, Consumer Advocate (OCA[1]), petition for review of the January 11, 2007, order of the Pennsylvania Public Utility Commission (PUC). We affirm.

In April 2006, the Utilities filed with the PUC Petitions for Approval of a Rate Transition Plan. The Customers and the OCA filed Formal Complaints in opposition to certain aspects of the plan, and the PUC ordered that Administrative Law Judges (ALJs) hold hearings on the matters. (PUC op. at 3-4, 6.)

After considering the issues, the ALJs issued a recommended decision addressing the questions raised about the plan. The Customers, the OCA and the Utilities each filed exceptions with the PUC, which disposed of the exceptions in its January 11, 2007, opinion and order. The parties each

---

1. The Consumer Advocate heads the Office of Consumer Advocate, which has a statutory duty to represent the interest of consumers before the Pennsylvania Public Utility Commission. Section 902–A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, added by section 1 of the Act of July 9, 1976, P.L. 903, *as amended*, 71 P.S. § 309–2.

sought reconsideration, but the PUC denied the requests with respect to the issues before us here. Now, the Customers, the OCA and the Utilities each petition this court for review of the PUC's determinations.[2]

## I. Utilities Issues

## A. Generation Rate Cap Exception

### 1. Background

The restructuring of the electric utility industry under the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801–2812, separated the three traditional functions of electric utilities, i.e., the generation, transmission and distribution of electricity. With the separation of these functions, Pennsylvania residents were able to choose to purchase their electricity from an electric generation supplier other than the local utility. If consumers did not make a choice, the local utility was required to provide them with electricity as the Provider of Last Resort (PLR). *ARIPPA v. Pennsylvania Public Utility Commission*, 792 A.2d 636 (Pa.Cmwlth. 2002), *appeal denied*, 572 Pa. 736, 815 A.2d 634 (2003).

Rate caps were established in exchange for utilities being able to recover their transition or stranded costs from ratepayers. *Id.* The rate caps for electric transmission and distribution expired on December 31, 2004, but the rate cap for electric generation will not expire until December 31, 2010. (PUC's op. at 28.) Until that time, a utility may request an exception to the generation rate cap where the "utility is subject to significant increases in the unit rate of fuel for utili-

ty generation or the price of purchased power that are outside of the control of the utility and that would not allow the utility to earn a fair rate of return." 66 Pa.C.S. § 2804(4)(iii)(D).

Here, the Utilities sought an exception to the generation rate cap, claiming that they are subject to significant increases in the price of purchased power that are outside of their control. In support of their request, the Utilities presented evidence showing that they had entered into various long-term contracts for base load PLR power but that those contracts did not cover the Utilities' peak load PLR supply needs. To meet peak load needs, the Utilities entered into a Partial Requirements Agreement with FirstEnergy Solutions (FES Agreement), an electric generation affiliate of the Utilities' parent corporation, FirstEnergy Corporation (FirstEnergy). The term of the FES Agreement was one year, after which FES had the ability to terminate the agreement on short notice. The FES Agreement worked well while the market cost of power was below rate cap levels. However, when it appeared that the cost of power would remain above rate cap levels, FES terminated the agreement.

Relying on this court's holding in *ARIPPA*, the PUC denied the Utilities' request for an exception, ruling that the Utilities failed to establish that the increases in the price of purchased power were outside of the control of the Utilities. The PUC found that the Utilities had control over their decision to enter into the FES Agreement, which allowed FES to terminate the agreement before the rate cap expiration date and to leave the Utilities

---

**2.** In addition to the parties, the Office of Small Business Advocate and The Commercial Group have filed briefs as intervenors. Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

without sufficient peak load PLR power. Although the Utilities argued that it was not possible for them to enter into long-term contracts for peak load PLR power, the PUC found that the Utilities could have entered into a full requirements contract for both base load and peak load PLR needs, instead of a partial requirements contract with FES.

## 2. *ARIPPA*

Before this court, the Utilities first argue that the PUC erred in relying on *ARIPPA* because the facts in *ARIPPA* are distinguishable from the facts in this case. We agree that the facts in *ARIPPA* are not identical to those before the court here; nevertheless, the holding in *ARIPPA* is instructive.

In *ARIPPA,* this court affirmed the PUC's approval of the merger of GPU, Inc. (GPU) with FirstEnergy.[3] This court also reviewed the PUC's decision to grant GPU's request for an exception to the electric generation rate cap based on the PUC's determination that increases in the price of purchased power were outside of GPU's control.

In seeking an exception in *ARIPPA,* GPU asserted that: (1) GPU was required to provide PLR power to more consumers than envisioned at the time of the restructuring of the electric utility industry; (2) prior to its merger with FirstEnergy, GPU made a reasonable and prudent decision to sell all of its electric generation assets; (3) thus, GPU needed to purchase electric generation on the open market to meet its PLR obligations; (4) wholesale electric prices climbed well above the levels of the capped rates; and (5) GPU had no control over the volatility of those market prices.

This court concluded that GPU failed to establish that it was subject to price increases that were outside of its control. In reaching that conclusion, this court stated:

> [T]he term "outside of the control" does not mean[ ] that ratepayers will act as the surety for companies that act to maximize their return, and not, as other utilities did, to protect their exposure from known and definable obligations.
>
> An event "outside of the control" of a person or group typically refers to sudden illness, fire, theft, acts of God and natural disasters, not situations where a party can take actions to protect himself or herself from risk. Strategic business planning always involves decisions on how much risk to accept and where the burden of risk is placed. In this case, GPU Energy made a choice to divest itself of its generation assets and, unlike other utilities, not to protect itself by entering into long-term contracts within the rate caps to protect itself from PLR costs. Instead, it made a bet that electric rates would remain below the rate caps and chose to maximize its profits. This was not an event outside of its control, but a conscious business decision. The General Assembly did not intend that if a utility lost money on choices it made, it would be allowed to recover more in rates. As Commissioner Brownell stated, "the statute did not establish a 'heads I win, tails you lose' construct." Because an event that is "outside of the control" does not mean the results of business decisions, it was plainly erroneous for the [PUC] to allow revenues to be increased above the legislatively mandated rate caps.

**3.** At the time of the merger, GPU held the Utilities as subsidiaries. Thus, after the merger, FirstEnergy became the parent company of the Utilities, and the Utilities became wholly-owned public utility subsidiaries of FirstEnergy.

*ARIPPA,* 792 A.2d at 665–66 (citation omitted). Thus, here, to obtain an exception to the electric generation rate cap under *ARIPPA,* the Utilities needed to prove that they were not subject to increased prices as a result of their own business decisions.

### 3. Availability of Long–Term Contracts

■ The PUC found that the Utilities could have entered into long-term contracts for PLR power and, thus, concluded that the Utilities were subject to increased prices as a result of their own business decisions. The Utilities argue that the record lacks substantial evidence to support the PUC's finding that the Utilities could have entered into long-term contracts for PLR power.[4] We disagree.

Richard La Capra, an energy industry consultant, testified on behalf of the OCA that:

> [A]fter the merger with FirstEnergy, the [Utilities'] ability to provide [PLR] service at capped rates was clearly enhanced. At that point, due to the merger with a company with generation assets, [the Utilities] were in essentially the same position as other Pennsylvania utilities such as PECO, PPL and West Penn Power who entered into long-term contracts with their affiliate generation companies to meet their [PLR] load at capped rates.

(R.R. at 203a, 224a.) La Capra elaborated, stating:

> PPL conducted a procurement process to obtain its [PLR] supply through 2009, the end of the rate cap for PPL. As a result of this process, [PPL] entered into a full requirements contract with its

affiliate for the provision of power supply to meet its [PLR] obligation through 2009. The PPL contract with its affiliate did not contain a termination clause like [the FES Agreement].

(R.R. at 226a–27a.) La Capra also explained:

> [The FES Agreement] was not an arms length transaction and it could have been anticipated that if market prices rose, the interest of [FirstEnergy] stockholders would clash with that of the [Utilities'] customers. . . . This is clearly a risk that was undertaken with a clear view of the various outcomes.

(R.R. at 226a.) According to La Capra, the Utilities "could have locked in longer term contract(s) with [FES,] their post-merger affiliate," (R.R. at 227a); moreover, the Utilities' own evidence shows that "there were contracts available around the time of the merger, and shortly thereafter, for extended time periods at prices at or below the rate caps," (R.R. at 228a; *see also* R.R. at 144a–45a).

This credible testimony by La Capra constitutes substantial evidence to support the PUC's finding that the Utilities could have entered into long-term contracts for PLR power but, instead, made a business decision to enter into a short-term contract with affiliate FES, betting that the market price of power would not exceed the rate cap before the rate cap expired. Thus, the Utilities cannot prevail on this issue.

### B. Consolidated Tax Savings

### 1. "Actual Taxes Paid" Doctrine

The Utilities do not file federal income tax returns on a stand-alone basis. Instead, the Utilities file their federal return

---

4. The Utilities also argue that they presented substantial evidence to establish that long-term contracts for peak load PLR power were not available. However, it is beyond the scope of this court's review to consider whether the record contains substantial evidence to support findings not made by the PUC.

as part of a consolidated group under their parent corporation, FirstEnergy. In filing its federal return, FirstEnergy offsets the positive taxable incomes of its subsidiaries with the negative taxable incomes of its subsidiaries, resulting in a lower net taxable income and lower tax liability.[5] (PUC op. at 98.)

■ "[W]here a utility realizes federal income tax savings because of its participation in a consolidated return, Pennsylvania law requires that those savings be passed on to the ratepayers by means of an adjustment to the utility's allowance for tax expense." *Barasch v. Pennsylvania Public Utility Commission*, 120 Pa. Cmwlth. 292, 548 A.2d 1310, 1311 (1988). This principle of law is known as the "actual taxes paid" doctrine. *Id.* Stated differently, "[a]ll tax savings arising out of participation in a consolidated return must be recognized in ratemaking, otherwise we would be condoning the inclusion of fictitious expenses in the rates charged to the ratepayers."[6] *Id.* at 1313 (quoting *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 568, 493 A.2d 653, 656 (1985)).

### 2. Merger Debt Interest

When GPU merged with FirstEnergy, FirstEnergy incurred merger debt by paying an acquisition premium, i.e., an amount above the book value of GPU. As a condition of approving the merger, the PUC prohibited the Utilities from recovering the acquisition premium, i.e., the merger debt, from ratepayers.

The PUC based this condition on *City of York v. Pennsylvania Public Utility Commission*, 449 Pa. 136, 295 A.2d 825 (1972), in which our supreme court held that, in considering whether to approve the merger of utilities, the PUC must consider the effect that the proposed merger is likely to have on future rates to consumers. In addition to this holding, our supreme court addressed an argument made by the opponents of the merger that, as a result of refinancing necessitated by the merger, the surviving company would have interest

5. In *Barasch v. Pennsylvania Public Utility Commission*, 120 Pa.Cmwlth. 292, 548 A.2d 1310, 1312 (1988) (citation omitted), this court explained:

When consolidated tax returns are used, each subsidiary of a parent corporation calculates its separate income, deductions, tax liability and tax credits on a stand-alone basis. However, the subsidiary does not then file a separate federal income tax return or pay the calculated tax to the Internal Revenue Service (IRS). Rather, the subsidiary submits its calculations ... to the parent corporation. As is permitted by [law], the parent corporation then offsets taxable income generated by some subsidiaries with tax losses and credits generated by other subsidiaries to arrive at a figure representing the taxable income of the consolidated group.

6. To determine "actual taxes paid" in the ratemaking context, the PUC is required to use the "modified effective tax rate" method.

An effective tax rate method calculates the consolidated tax savings by determining the difference between the total of the stand-alone tax liabilities of all of the members of the consolidated group and the tax actually paid after offsetting of income because of consolidation and then allocates those savings among all of the members. The rationale of this method is that, because the parent pays tax at the marginal rate but on an amount of income reduced by consolidated offsetting, the parent, and in turn the subsidiaries, should be viewed as paying at an "effective" tax rate that is below what they would have paid if the tax had been calculated by applying the marginal tax rate to the full income of each member on a stand-alone basis.

*Barasch*, 548 A.2d at 1313–14. The "modified" effective tax rate method makes modifications to avoid any flow-through of investment tax credits or accelerated depreciation benefits, which would violate federal tax law. *Id.*

costs on the merger debt that it would charge to consumers. On this matter, our supreme court held that a utility may not collect merger debt interest from its customers. *Id.*

■ Clearly, then, the Utilities cannot recover their merger debt or merger debt interest from ratepayers. Nevertheless, the Utilities proposed to the PUC that, in order to properly balance the interests of ratepayers and utilities in the determination of a just and reasonable rate,[7] the PUC should exclude the Utilities' merger debt interest from the calculation of the Utilities' consolidated tax savings. The PUC rejected this proposal based on the "actual taxes paid" doctrine.

### 3. Equitable Exception

In their appeal to this court, the Utilities acknowledge that the PUC, in rejecting their proposal, simply applied the "actual taxes paid" doctrine. However, the Utilities ask this court to recognize an equitable exception to the "actual taxes paid" doctrine where there has been a merger, and, as a "penalty," the utilities may not recover merger debt from ratepayers. (Utilities' reply brief at 21–23.) In making this argument, the Utilities assert that their proposal to the PUC to remove merger debt interest from the calculation of consolidated tax savings is not the same as a proposal to amortize the merger debt through the rates charged to customers. (Utilities' reply brief at 22.)

■ We decline to recognize such an exception. In *City of York,* our supreme court made clear that, where there is a merger, merger debt interest may not be collected from ratepayers. Although the Utilities characterize the PUC's refusal to allow them to collect their merger debt from ratepayers as a "penalty" and the refusal to remove merger debt interest from the consolidated tax savings calculation as an extension of that "penalty," disallowing the collection of merger debt interest from ratepayers is the law under *City of York,* not a "penalty." [8] Thus, there is no equitable basis for an exception to the "actual taxes paid" doctrine based on a utility's inability to recover merger debt from ratepayers.

### II. OCA/Customers Issues

### A. Transmission Service Charge Rider

As indicated above, the rate cap for electric generation will expire on December 31, 2010, but the rate cap for electric transmission already has expired. With the expiration of the electric transmission rate cap, the Utilities proposed removing transmission costs from their base rates and establishing a reconcilable Transmission Service Charge (TSC) Rider.[9]

### 1. Congestion Costs

The Utilities also proposed including congestion costs in the TSC Rider. Congestion occurs when electricity flowing over one portion of a transmission grid nears capacity. To deal with congestion,

---

7. In determining just and reasonable rates, the PUC has discretion to determine the proper balance between the interests of ratepayers and utilities. *Popowsky v. Pennsylvania Public Utility Commission,* 542 Pa. 99, 665 A.2d 808 (1995).

8. We note that the removal of merger debt interest from the consolidated tax savings calculation would result in the ratepayers paying some portion of the Utilities' merger debt interest, which would be contrary to *City of York.*

9. The Utilities would reconcile the TSC Rider each year to determine whether the Utilities collected more than enough or not enough from its PLR customers to cover transmission charges. (R.R. at 91a.)

the Utilities use the transmission services of PJM Interconnection, LLC (PJM). PJM manages congestion for electric utilities through its Open Access Transmission Tariff (OATT), which has been approved by the Federal Energy Regulatory Commission (FERC). PJM manages congestion by dispatching electric generation under its control. PJM initially provides electric generation to the Utilities from the lowest cost electric generating unit, but, when congestion occurs, PJM shifts electric generation to a more expensive generating unit. To reduce such congestion costs, PJM recently authorized $1.3 billion for electric transmission upgrades.

Although there is a generation cost associated with congestion on a transmission grid, the PUC approved the inclusion of congestion costs in the TSC Rider as transmission costs because: (1) the Utilities pay PJM for transmission services pursuant to the OATT, a transmission tariff; (2) the OATT includes a specific charge for transmission congestion, and the OATT bill that the Utilities receive from PJM contains a separate charge for transmission congestion; (3) there would be no costs associated with PJM's switching of electric generators but for the congestion on the transmission grid; and (4) congestion costs are reduced by transmission upgrades, not generation upgrades.

a. Transmission or Generation Costs

■ The OCA and the Customers argue that the PUC improperly approved the inclusion of congestion costs in the TSC Rider as transmission costs. The OCA and the Customers contend that, because there is a generation cost associated with congestion on a transmission grid, conges-

tion costs should be considered generation costs and be subject to generation rate caps. We disagree.

Section 2803 of the Competition Act defines "Transmission and distribution costs" as follows:

All costs directly or indirectly incurred to provide transmission and distribution services to retail electric customers. This includes the return of and return on facilities and other capital investments necessary to provide transmission and distribution services and associated operating expenses, including applicable taxes.

66 Pa.C.S. § 2803. Here, the cost of switching electric generators and the cost of upgrading transmission facilities are costs directly or indirectly incurred to provide transmission services to customers. Thus, the PUC did not err in concluding that congestion costs belong in the TSC Rider as transmission costs.[10]

b. Federal Preemption

■ The Customers argue that the PUC's inclusion of congestion costs in the TSC Rider as transmission costs is contrary to decisions of the FERC and that the FERC's federal decisions preempt the PUC's determination. The PUC argues that the Customers failed to raise federal preemption as an issue before the PUC, and, thus, the matter is waived pursuant to Pa. R.A.P. 1551(a) (stating that, ordinarily, no question shall be considered that was not raised before the government unit). The Customers assert that they raised concerns about a conflict with FERC on pages 3 to 7 of the exceptions they filed with the PUC and elsewhere. (Customers'

---

10. The OCA also argues that Financial Transaction Rights (FTRs) and Auction Revenue Rights (ARRs), which are financial tools that the Utilities use to mitigate their congestion costs risk, should be considered generation costs rather than transmission costs. However, having concluded that congestion costs are properly considered transmission costs, we also conclude that FTRs and ARRs are properly considered transmission costs.

reply brief at 15–16.) However, we have examined all pages cited by the Customers and have found no preemption argument. (R.R. at 876a–80a.) Thus, the matter is waived.

### c. Violation of Section 2805(a)

■ The Customers argue that the PUC's inclusion of congestion costs in the TSC Rider as transmission costs violates section 2805(a) of the Competition Act.[11] The PUC argues that the Customers failed to raise a section 2805(a) issue before the PUC, and, thus, the matter is waived. The Customers acknowledge that they "did not specifically cite this section of the Competition Act" in their arguments before the PUC, but they contend that this failure should not render their argument waived. (Customers' reply brief at 17 n. 12.) We disagree. Because the Customers failed to mention section 2805(a) in their arguments before the PUC, it was not possible for the PUC to examine the statutory provision, consider any argument based on the provision and make a determination. Thus, the matter is waived.

### d. Re-bundling of Rates

The Customers argue that the PUC's inclusion of congestion costs in the TSC Rider as transmission costs constitutes an inappropriate re-bundling of rates and a violation of the generation rate cap. However, this argument assumes that the PUC erred in concluding that congestion costs are transmission costs rather than generation costs. We have determined that the PUC did not err in that regard; therefore,

the Customers cannot prevail on this argument.

### B. 2006 Deferred Transmission Costs
#### 1. Background

In May 2006, the PUC granted a request by the Utilities to defer, for accounting and financial reporting purposes, incremental transmission charges that they would incur during 2006 under PJM's OATT. The Utilities stated that they would incur the costs primarily as a result of the expansion of PJM in 2004 and 2005 under a Regional Transmission Expansion Plan (RTEP) approved by FERC. PJM's expansion involved integration of five control zones, which required that PJM add transmission and generation resources that had new cost structures, load requirements and transmission characteristics. PJM's addition of new resources changed patterns of congestion, causing congestion costs to increase 179% for 2005. Moreover, congestion costs for 2006 were forecast to be 450% above 2004 levels.[12] (R.R. at 133a, 136a–37a.)

#### 2. Retroactive Recovery

■ In the matter before us here, the Utilities sought approval from the PUC to retroactively recover the 2006 transmission costs. The PUC granted approval, and the OCA now argues that the PUC erred in doing so. We disagree.

■ In *Popowsky v. Pennsylvania Public Utility Commission*, 868 A.2d 606 (Pa.Cmwlth.2004)(*Popowsky II* ), this court set forth a three-pronged approach for determining whether a utility should be

---

11. 66 Pa.C.S. § 2805(a). Section 2805(a) of the Competition Act requires that the PUC work with the federal government to establish independent system operators to operate the transmission system and interstate power pools and to ensure the continued provision of adequate, safe and reliable electric service

to the citizens and businesses of the Commonwealth.

12. We note that PJM expected its planned transmission upgrades to significantly reduce congestion costs in future years. (R.R. at 137a.)

permitted to recover its expenses retroactively. First, we consider whether the costs arose out of an inaccurate projection of costs in an earlier rate proceeding,[13] whether the costs were anticipated and whether they were imposed on the utility from the outside. Second, we evaluate the extraordinary nature of the costs, including whether they are non-recurring expenses arising from a one-time event and whether they are legitimate operating expenses that will never be recovered if retroactive recovery is denied. Finally, we analyze whether the utility claimed the expenses at the first reasonable opportunity and whether the utility can absorb the expenses with the current revenue from its existing tariff. *Id.*

As for the first prong, the 2006 transmission charges did not arise out of an inaccurate projection of costs in earlier rate proceedings.[14] Rather, the charges arose out of PJM's expansion in 2004 and 2005. Although the Utilities were aware of PJM's expansion before 2006, they did not anticipate the impact of the expansion on their congestion costs in 2006.[15] Moreover, inasmuch as the costs were imposed upon the Utilities by PJM as a result of expansion, the costs were imposed from the outside. Thus, the Utilities have satisfied the first prong.

As for the second prong, the 450% increase in congestion costs resulting from PJM's integration of five different systems is an extraordinary increase.[16] That increase resulted from PJM's expansion, a one-time event; thus, the costs are non-recurring. Moreover, the costs are legitimate operating expenses under the OATT, and, because the Utilities' new rates will not go into effect until 2007, the Utilities will not be able to recover their 2006 transmission costs if retroactive recovery is denied. Thus, the Utilities have satisfied the second prong.

Finally, the Utilities requested recovery of the 2006 transmission costs in April 2006, once they had a forecast of their 2006 costs. (*See* R.R. at 91a, 101a–03a, 111a, 120a–22a, including an exhibit showing actual costs for 2005 and budgeted costs for 2006.) We agree with the PUC that the Utilities thus claimed the 2006 expenses at the first reasonable opportunity. Moreover, there is no evidence that the Utilities can absorb the 2006 expenses from current revenues. Therefore, the Utilities satisfied the third prong.

Because the Utilities satisfied the three prongs for retroactive recovery set forth in *Popowsky II*, the OCA cannot prevail on this issue.

13. The PUC may not allow utilities to recover deficits created by inaccuracies in its prior rate authorizations. *Popowsky II*.

14. The PUC found that the Utilities' last rate proceedings occurred in 1992 and 1986. (R.R. at 847a.)

15. In 2004, the Utilities concluded that they could not absorb transmission costs using the base rates. (R.R. at 134a.) Thus, in January 2005, after the transmission rate cap expired, the Utilities filed with the PUC a request to defer 2005 transmission costs beginning January 1, 2005. (R.R. at 134a–35a.) However, in April 2006, the Utilities decided to absorb

2005 costs and seek to recover only the 2006 transmission costs. (R.R. at 135a.)

16. The OCA argues that transmission costs are not extraordinary but, rather, are usual and recurring costs of business. The OCA contends that, to be extraordinary expenses, the expenses must result from an act of God or a terrorist attack, not from congestion problems related to the expansion of transmission facilities. (OCA's brief at 23.) However, we agree with the PUC that a 450% increase in congestion costs is extraordinary and that the particular difficulties of the PJM expansion in this case render the increased expense a non-recurring one.

### 3. Carrying Charges

■ In allowing the Utilities to retroactively recover their 2006 deferred transmission costs, the PUC also permitted the Utilities to recover their carrying charges, i.e., interest. The Office of Small Business Advocate (OSBA), an intervenor here, argues that the PUC erred in permitting the recovery of carrying charges.

The PUC and the Utilities argue that this issue is waived because the actual petitioners in this case did not challenge the PUC's allowance of interest in their petitions for review. The OSBA claims that the OCA and the Customers raised the issue in their petitions for review by stating that the PUC allowed the Utilities to recover their 2006 deferred transmission costs with interest. (OSBA's reply brief at 7.) However, we have reviewed the petitions for review, and neither the OCA nor the Customers object to the PUC's allowance of interest in their statement of objections to the PUC's order.[17] Thus, the matter is waived.[18]

### C. Universal Service Cost Rider

■ The Utilities sought PUC approval of a Universal Service Cost Rider to pay for universal service programs, i.e., programs that help low-income customers to maintain electric service.[19] Although universal service programs assist residential customers only, the Utilities proposed that the Universal Service Cost Rider apply to all customer classes. The PUC approved the Universal Service Cost Rider, but the PUC ruled that the Universal Service Cost Rider would apply only to residential customers. The OCA argues that the PUC erred in limiting the Utilities' recovery of universal service costs to residential customers. We disagree.

Section 2802(17) of the Competition Act provides:

> There are certain public purpose costs, including programs for low-income assistance, energy conservation and others, which have been implemented and supported by public utilities' bundled rates. The public purpose is to be promoted by continuing universal service and energy conservation policies, protections and services, and full recovery of such costs is to be permitted through a **nonbypassable** rate mechanism.

66 Pa.C.S. § 2802(17) (emphasis added). Section 2804(9) of the Competition Act provides, in pertinent part:

> The [PUC] shall ensure that universal service and energy conservation policies, activities and services are appropriately funded.... Policies, activities and services under this paragraph shall be funded in each electric distribution territory by **nonbypassable**, competitively-neutral cost-recovery mechanisms that

---

17. Indeed, in challenging the recovery of 2006 deferred transmission costs in their briefs, neither the OCA nor the Customers argue in the alternative that, even if the PUC properly allowed the recovery of the deferred costs, the PUC improperly allowed the recovery of carrying charges.

18. *See* Pa. R.A.P. 1513(d) (stating that a petition for review shall contain a general statement of the objections to the determination and that the general statement will be deemed to include every subsidiary question fairly comprised therein); Pa. R.A.P. 2102 (stating that, for purposes of briefing and argument,

intervenors shall be subject to the rules applicable to the party on whose side the intervenor is principally aligned); *Van Doren v. Mazurkiewicz*, 695 A.2d 967 (Pa.Cmwlth. 1997) (stating that, when a petitioner fails to raise an issue in the petition for review, it is considered waived).

19. *See* section 2803 of the Competition Act, 66 Pa.C.S. § 2803 (defining "Universal service and energy conservation" to include programs that help low-income customers to maintain electric service).

fully recover the costs of universal service and energy conservation services. 66 Pa.C.S. § 2804(9) (emphasis added).

The OCA argues that the word "nonbypassable" in these sections means that the rate mechanism may not allow any customer class to by-pass a contribution to the cost of universal service programs. In making this argument, the OCA relies upon this court's decision in *Lloyd v. Pennsylvania Public Utility Commission,* 904 A.2d 1010 (Pa.Cmwlth.2006), *appeal denied,* 591 Pa. 676, 916 A.2d 1104 (2007).

In *Lloyd,* this court considered an argument that the Sustainable Energy Fund (SEF) programs should not be funded through electric distribution rates because the SEF programs benefit electric generation, not electric distribution, service.[20] This court commented that the Competition Act "only provides that it be funded by 'non-bypassable rates' without any requirement that it be by a rate that is directly benefited by the program." *Id.* at 1027. Thus, under *Lloyd,* there is no statutory requirement that the funding for special programs come only from those who benefit from the programs. However, the lack of such a requirement does not mean that funding for special programs must come from those who do not benefit. In fact, in *Lloyd,* this court pointed out that, according to the credible evidence, SEF programs do benefit distribution service. Therefore, SEF programs are funded by those who benefit from them. Clearly, then, *Lloyd* is not dispositive here.

The PUC contends that the OCA has taken the term "nonbypassable" out of context. The ALJs, with whom the PUC agreed, stated:

In the context of a regulatory environment in which there is retail competi-

tion, a nonbypassable charge is one in which customers pay the charge whether they "shop" for generation supply or take service under [PLR] rates from an EDC. A nonbypassable charge would generally require that the charge be recovered in a rate that is paid by all customers in the class, both shopping and non-shopping. Such a charge does not imply an allocation scheme in which costs are assigned to all rate classes. Rather, in the context of the Competition Act, a nonbypassable charge means that universal service costs that were in the bundled rates for a particular customer class should remain within that class after rate unbundling. Specifically, if universal service costs were recovered only from residential customers prior to unbundling, **as they were,** then all residential customers should continue to pay these costs regardless of whether a residential customer begins shopping or does not shop.

(R.R. at 859a–60a) (emphasis added).

■ When statutory language is not clear, this court may defer to an administrative agency's interpretation to ascertain legislative intent. *Pennsylvania Power Company v. Public Utility Commission,* 932 A.2d 300 (Pa.Cmwlth.2007). Here, it is reasonable to interpret the word "nonbypassable" in the context of deregulation. The Competition Act allowed consumers to shop, or not, for electricity, and, prior to de-regulation, residential customers funded universal service costs. Thus, in sections 2802(17) and 2804(9) of the Competition Act, "nonbypassable" reasonably means that residential consumers cannot by-pass their prior funding of universal service costs by their choice, or non-choice, of an electric generation supplier. Inasmuch as the PUC's interpretation of

---

**20.** The SEF is a fund to promote the development and use of renewable energy and clean energy technologies, energy conservation and efficiency. *Lloyd.*

the word "nonbypassable" in the Competition Act is reasonable, we shall defer to it.[21]

Accordingly, we affirm.

## ORDER

AND NOW, this 7th day of November, 2008, the order of the Pennsylvania Public Utility Commission, dated January 11, 2007, is hereby affirmed.

**21.** We also note that the Competition Act defines the term "Competitive transition charge" as a "nonbypassable charge applied to the bill of every customer...." 66 Pa.C.S. § 2803. If the legislature intended a "nonbypassable" charge to be one that every customer must pay, regardless of customer class, then it made no sense for the legislature to add "applied to the bill of every customer" in this definition. The word "nonbypassable" would have been sufficient by itself.