METROPOLITAN EDISON COMPANY
and Pennsylvania Electric
Company, Petitioners

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

William R. Lloyd, Jr., Small Business
Advocate, Petitioner

v.

Public Utility Commission, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 2010.

Decided June 14, 2011.

Anthony C. DeCusatis, Philadelphia, for petitioner Metropolitan Edison Company.

Michael L. Swindler, Harrisburg, for respondent.

Vasiliki Karandrikis, Harrisburg, for intervenor Penelec Industrial Customer Alliance.

William R. Lloyd, Jr., Harrisburg, for intervenor Office of Small Business Advocate.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

Before this Court are two consolidated cases involving a March 3, 2010, order (Order) of the Public Utility Commission (Commission). In the first case, (532 C.D. 2010), Metropolitan Edison Company (MetEd) and Pennsylvania Electric Company (Penelec) (together, Companies) petition for review of the Order which rejected

the Recommended Decision (RD) of an administrative law judge (ALJ) and denied the Companies' request to classify "marginal transmission losses" or "line losses" [1] as transmission costs under Companies' Transmission Service Charge (TSC) Riders so that Companies could recover those costs from ratepayers under the TSC Riders. The Commission, instead, found such costs to be generation-related costs, subject to rate caps until December 31, 2010, and not recoverable from ratepayers. In the second case, (632 C.D. 2010), William R. Lloyd, Jr., Small Business Advocate (OSBA) cross-petitions for review of the Commission's Order to the extent it adopted the ALJ's recommendation allowing Companies to recover the interest, i.e., carrying charges, on previously incurred transmission costs related to the "unwinding" of hypothetical generation contracts. The OSBA intervened in Companies' Petition for Review, and Companies have intervened in the OSBA's Cross–Petition for Review. [2] The Met–Ed Industrial Users Group and the Penelec Industrial Customer Alliance (Customers) have intervened in both Companies' and the OSBA's petitions for review. [3]

## I. 532 C.D. 2010—Line Losses

On April 10, 2006, Companies filed with the Commission a Rate Transition Plan (RTP) seeking to establish TSC Riders through which Companies sought to recover the following costs: (1) network integration transmission service (NITS) costs and Federal Energy Regulatory Commission (FERC)-approved PJM Interconnec-

---

1. Line losses represent the amount of energy that is lost between the generation facility and the delivery of that energy at its end point.

2. The OSBA asserts that, should this Court reverse the Commission's determination as to line losses, we should remand the matter to the Commission to consider whether Compa-

nies should be permitted to collect carrying charges on these costs.

3. Customers take no position with regard to the OSBA's Cross–Petition for Review at 632 C.D. 2010. (Customers' Br. at 4 n. 1.)

tion, LLC (PJM) [4] transmission congestion charges; (2) FERC-approved transmission-related ancillary and administrative costs incurred and administered by PJM; (3) "other" FERC-approved costs similar to those in (1) and (2) that may arise in the future and charged under PJM's Open Access Transmission Tariff (OATT); and (4) transmission risk management costs incurred to mitigate risks associated with transmission-related costs. Companies' 2006 RTP filings included the recovery of congestion costs, but not line losses, despite the fact that PJM was assessing Companies for average line losses. On January 11, 2007, the Commission approved the TSC Riders, including the congestion costs, but with no reference to recovering average line losses (2007 Order). The Commission's 2007 Order was appealed to this Court, which affirmed, *inter alia*, the Commission's determination that congestion costs may be deemed a part of transmission costs and, thus, not subject to Companies' generation rate cap in effect at that time. *Met–Ed Industrial Users Group, et al. v. Pennsylvania Public Utility Commission,* 960 A.2d 189 (Pa. Cmwlth.2008) (*MetEd I*). Citing Section 2803 of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. § 2803, which defines "transmission costs" as all costs "directly or indirectly incurred to provide transmission and distribution services to retail electric customers," we concluded that the Commission did not err in determining that the congestion costs could be recovered as transmission costs. *Id.* at 198.

On March 30, 2007, Companies submitted their first quarterly report of the TSC Riders, which did not attempt to collect line losses. On June 1, 2007, PJM changed how it sought payment for line losses from calculating them based on system average losses to marginal losses, with Companies receiving a bill for marginal losses in July 2007. On July 13, 2007, Companies filed their second quarterly report, which included marginal line losses as a line item in the amount of zero, but did not seek to recover line losses for January 2007 through May 2007. In their third (revised) quarterly report, filed on October 31, 2007, Companies included, for the first time, line losses in their cost worksheets for the period between June 2007 and August 2007. Companies have not sought approval to amend their tariffs to include line losses in the definition of transmission service charges to be collected under the TSC Riders. On April 14, 2008, Companies filed their initial annual TSC Reconciliation Filings for the 2008–2009 TSC period, which proposed significant increases in Companies' TSC rates through proposed tariff supplements. The Reconciliation Filings essentially indicate the estimated amount of under-collection of transmission-related costs resulting from the billing of the TSC during the relevant period, which included the recovery of line losses for the first time. Met-Ed's proposed Tariff Supplement No. 5 (Supplement 5M) indicated that it sought to recover: (1) $421.6 million in transmission-related costs, including $144.8 million in under-recovered transmission costs, $10.7 million of which represented carrying charges, i.e., interest, between January 11, 2007, and March 31, 2008; and (2) $277.1 million in projected transmission cost increases. MetEd also presented, alternatively, Tariff Supplement No. 6 (Supplement 6M), which would amortize the under-collected transmission costs over a longer period of time. Penelec experienced under-collection and projected in-

---

4. PJM is a regional transmission organization (RTO) that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia.

creased TSC costs of $3.8 million and $16.2 million, respectively and proposed Tariff Supplement No. 5 (Supplement 5P). Companies' "under-collected" costs included the line losses assessed by PJM beginning June 1, 2007.[5]

Customers, the OSBA, and the Office of Consumer Advocate (OCA) filed complaints against Companies' Annual TSC Reconciliation Filings. The Commission initiated an investigation into Companies' Reconciliation Filings, consolidated the complaints, and assigned the matters to the ALJ. Following an evidentiary hearing and briefing period, the ALJ agreed in his RD with Companies that they were entitled to recover line loss costs as transmission-related costs. Customers requested the ALJ to reopen the record to introduce the Companies' Default Service Programs (DSP) Filings. Customers contended the DSP Filings established that line loss costs were generation-related costs and not recoverable through the TSC Riders.[6] The ALJ rejected Customers' request by interim order and the DSP Filings were not introduced into the record. Customers, the OSBA, and OCA filed exceptions to the RD with the Commission.

After considering the exceptions, the RD, and the record made before the ALJ, the Commission entered the Order holding that, unlike congestion costs, line loss costs were generation-related and, therefore, not recoverable as transmission charges under Companies' TSC Riders. The Commission noted that, unlike the proceedings on Companies' 2006 RTP filings' inclusion of con-gestion costs as transmission costs, the Companies failed to present testimony supporting its current contention that line loss costs should also be collected under the TSC Riders. (Order at 2.) The Commission rejected as overly simplistic Companies' argument that because line losses occur during "transmission" those losses must be transmission costs. Instead, the Commission held that these losses are "energy" and that the price of such losses is related to the generation of that energy. (Order at 13.) The Commission likewise rejected Companies' arguments that the Commission is bound by how PJM and the FERC characterizes these costs in PJM's bills or in the OATT, holding that the fact that PJM changed how it billed these losses bears no relationship to whether the item is transmission- or generation-related and that the OATT clearly includes both transmission and generation charges. (Order at 13–14.) Rather, the Commission held that its determination was based on the nature of the service provided to the consumer and how they have been historically charged to the consumers. (Order at 13.) The Commission agreed with Customers that, historically, these types of losses have been included in generation costs and not transmission or distribution costs. (Order at 19–20.) The Commission noted that energy is lost both during transmission from the generator to the distribution point and in the distribution of the energy to the end-use consumers, but Companies do not argue, and Customers' witness testified, that no utility has argued, to his knowledge, that distribution

5. The line losses sought to be recovered are: $38,655,803 in past line losses, plus $2,548,445 in carrying charges for MetEd customers; and $7,210,687 in past line losses, plus $413,673 in carrying charges for Penelec customers.

6. On February 20, 2009, Companies filed the DSP Filing proposing to modify the way

transmission costs were collected from consumers, eliminating the TSC Rider, and replacing it with a NITS Rider. Under this plan, the costs that were recovered using the TSC Rider, congestion, line losses, and risk management costs, would be recovered through Companies' default generation rates.

system losses of energy should be collected in distribution rates. The Commission further held that it is within its discretion to allocate costs through a TSC Rider and that it is unreasonable for Companies to suggest that it is required to "rubber stamp" the recovery of such costs simply because they are imposed by PJM. (Order at 17.)

Additionally, the Commission held that, even if the line loss costs were considered to be transmission-related, Companies would not be entitled to retroactive recovery because they did not seek recovery at the first reasonable opportunity. *See Met-Ed I*, 960 A.2d at 201; *Popowsky v. Pennsylvania Public Utility Commission*, 868 A.2d 606, 611 (Pa.Cmwlth.2004) (*Popowsky II*). Finally, the Commission determined that, because line loss costs are generation-related, the Companies cannot recover them until Companies' generation rate caps expire at the end of 2010. (Order at 18.) Accordingly, the Commission directed Companies to, *inter alia*, submit new Tariffs or Tariff Supplements consistent with its Order, removing completely line loss costs from the TSC.[7] In his Dissenting Statement, Commissioner Robert F. Powelson agreed with the position of Companies and the ALJ that line loss costs were transmission-related because: they were not included in the generation rates in the 1998 Restructuring Agreement; the result is consistent with FERC's treatment of line loss costs; and the result is consistent with *MetEd I* because each of the four factors considered in that case were met here. Furthermore, the Dissenting State-ment questioned the majority's more restrictive interpretation of the definition of transmission costs. Companies now petition this Court for review.[8]

### A. Whether the Commission's findings of fact are supported by substantial evidence.

■ Companies first argue that the Commission's Order should be reversed because the Commission's findings of fact, including the Commission's finding that line loss costs were and are being recovered in Companies' generation rates, are not supported by substantial evidence. Essentially, Companies assert that, in rejecting the ALJ's recommendation that line loss costs were transmission costs recoverable through the TSC Riders, the Commission ignored, disregarded, misstated, or misinterpreted the evidence in the record. According to Companies, the Commission, *inter alia:* (1) disregarded the Companies' witness's characterization of line losses as transmission costs, (Met-Ed Statement No. 3–R at 3, R.R. at 335a; Penelec Statement No. 3–R at 3, R.R. at 646a); (2) improperly relied on Companies' proposed, but never implemented, restructuring plans from Companies' 2006 RTP Proceeding and 1998 Restructuring Proceeding, rather than the approved 1998 Restructuring Agreement, to determine that Companies intended line losses to be included in generation costs; (3) mischaracterized the evidence submitted by Customers' witness to support its finding that average line loss costs imposed by PJM

---

7. Companies requested, and received, a stay from the Commission's suspension of the tariff modification requirement and the Commission allowed Companies to continue collecting marginal losses, with interest, through the end of 2010 and to commence giving refunds on January 1, 2011 or a decision is issued from this Court, whichever was sooner. (Commission Order, March 25, 2010.)

8. This Court's review of Commission's orders is limited; "[w]e must determine whether constitutional rights were violated, an error of law was committed or whether the findings, determinations or order are supported by substantial evidence." *Popowsky II*, 868 A.2d at 608 n. 3.

prior to June 1, 2007, were included in generation costs; and (4) misinterpreted the inclusion of line loss costs in the Locational Marginal Price (LMP), because this provides the appropriate price for power **delivered** to a specific location and, therefore, is related to the transmission of energy. Companies further assert that the Commission's finding that line losses were not included in the TSC Riders is improper because the TSC Riders expressly include "all other future costs" imposed by PJM, and these costs were "future costs" imposed by PJM.

■ In rate case proceedings, such as this case, Section 315 of the Public Utility Code (Code), 66 Pa.C.S. § 315, places the burden of proof on the utility to establish the reasonableness of its rates. Pursuant to Section 102 of the Code, 66 Pa.C.S. § 102, a public utility's rates include, *inter alia*, every individual charge that utility demands for any service offered, rendered, or furnished by the utility, whether received directly or indirectly. This Court has interpreted Section 315 as placing "the burden of proving the justness and reasonableness of a proposed rate hike squarely on the utility. It is well-established that the evidence adduced by a utility to meet this burden must be substantial." *Lower Frederick Township Water Company v. Pennsylvania Public Utility Commission*, 48 Pa.Cmwlth. 222, 409 A.2d 505, 507 (1980). While the burden of production may shift, the burden of proof remains on the utility to establish the justness and reasonableness of every component of its rate request, and this burden is an affirmative one. *Berner v. Pennsylvania Public Utility Commission*, 382 Pa. 622, 631, 116 A.2d 738, 744 (1955). Thus, Companies bear a substantial burden of proving that the line loss costs involved in this case are transmission-related costs that can be

properly recovered by increasing the TSC Rider.

■ When reviewing an agency's findings of fact, this Court will defer to those factual findings if they are supported by substantial evidence. *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission*, 137 Pa.Cmwlth. 282, 585 A.2d 1151 (1991). The Commission is the ultimate fact finder. *See* Section 335(a) of the Code, 66 Pa.C.S. § 335(a) (stating that, after reviewing an administrative law judge's initial decision, the Commission has all the powers which it would have in making the initial decision); *Pennsylvania Power Company v. Pennsylvania Public Utility Commission*, 155 Pa.Cmwlth. 477, 625 A.2d 719, 726 (1993) (holding that "an ALJ's decision may always be overruled based upon contrary findings by the [Commission] if the [Commission's] findings are based on substantial evidence"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 275, 501 A.2d 1383, 1387 (1985). "[I]n a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the fact[ ]finder, rather, the pertinent inquiry is whether there is any evidence which supports the fact[ ]finder's factual finding." *Mulberry Market, Inc. v. City of Philadelphia, Board of License and Inspection Review*, 735 A.2d 761, 767 (Pa. Cmwlth.1999). "A capricious disregard of evidence occurs when there is a 'willful, deliberate disbelief of an apparently trustworthy witness, whose testimony one has no basis to challenge.'" *Cerasaro v. Workers' Compensation Appeal Board (Pocono Mountain Medical, Ltd.)*, 717 A.2d 1111, 1113 (Pa.Cmwlth.1998) (quoting

*Gallo v. Workmen's Compensation Appeal Board (United Parcel Service)*, 95 Pa. Cmwlth. 158, 504 A.2d 985, 988 n.2 (1986)). However, there is no capricious disregard of record evidence merely because the Commission reaches a different conclusion than that argued by the proponent of the evidence. *Popowsky v. Pennsylvania Public Utility Commission*, 853 A.2d 1097, 1110 (Pa.Cmwlth.2004). Where the Commission is presented with a choice of actions, each fully developed in the record, its decision is an implicit acceptance of one and a rejection of the other. *Barasch v. Pennsylvania Public Utility Commission*, 101 Pa.Cmwlth. 76, 515 A.2d 651 (1986). We note that, where Companies refer to their own evidence and the Commission did not rely on that evidence, but on Customers' evidence, we conclude that the Commission implicitly rejected that evidence, which the Commission may do in its role as fact finder.

The Commission and Customers assert that the Commission's findings of fact, including its findings that line loss costs are generation-related and that Companies included line loss costs in their generation-related costs, are supported by substantial evidence. This evidence included the testimony of Stephen Baron, Customers' expert witness, that Companies traditionally included line loss costs in their generation rates, stating that "[l]osses have always been recognized as a part of energy cost, whether computed on an average . . . or marginal . . . basis," and that "[line] losses are a part of the cost of generation and are therefore subject to the generation rate cap." (Customers' Statement No. 1 at 16–17, R.R. at 672a–73a.) Mr. Baron examined how Companies unbundled their rates during Companies first Restructuring Proceeding, and noted that the evidence in that proceeding indicated that average line loss costs were "previously collected in generation rates and/or the Companies'

Energy Cost Rate." (Customers' Statement No. 1 at 16, R.R. at 672a.) He did not believe the fact that PJM changed its method of how it collected these costs, from average to marginal, warranted a change to the unbundling method applied during the Restructuring Proceeding or that PJM's billing process makes line loss costs "a legitimate transmission cost, especially in light of the history of ratemaking in Pennsylvania and the Companies' own unbundled cost analyses." (Customers' Statement No. 1 at 17, R.R. at 673a; Customers' Statement No. 1–S at 4–5, R.R. at 763a–64a.) Mr. Baron compared line losses with distribution line losses, i.e., the loss of energy at the distribution point, and noted that, to his knowledge, no utility, including Companies, recovers distribution line loss costs as a distribution charge, but recovers those losses as part of the generation rate. (Customers' Statement No. 1 at 17, R.R. at 673a.) He further testified that, based on his review of the testimony of one of Companies' witnesses in the 2006 RTP Proceedings and an exhibit submitted by that witness, line loss costs were included in the Companies' generation rates. (Customers' Statement No. 1 at 17–18, R.R. at 673a–74a; Ex. SJB–6, R.R. at 757a.) In its brief to the ALJ, the OCA agreed with Mr. Baron's interpretation of Exhibit, SJB–6, which shows that MetEd's generation supply price was adjusted for line loss costs. (OCA's Main Br. at 4, R.R. at 1191a.) Mr. Baron also reviewed Companies' work papers from the 1998 Restructuring Agreement, Exhibits SJB–1S and SJB–2S, and indicated that these papers demonstrated that Companies' proposed unbundled rates included energy-related costs in the production, i.e., generation, component. (Customers' Statement No. 1–R at 4–5, R.R. at 763a–64a; Exs. SJB–1S and SJB–2S, R.R. at 773a–74a.)

Additionally, Mr. Baron testified that, "[n]otwithstanding the fact that the level of marginal losses are influenced by the structure and design of the physical transmission network, *losses are energy costs* and should be recovered in the generation charge, not the TSC." (Customers' Statement No. 1 at 16, R.R. at 672a (emphasis in the original).) Mr. Baron explained that line loss costs are a component of the LMP and are computed **based on the marginal cost of increased power injections** at each generator bus. (Customers' Statement No. 1 at 10, R.R. at 666a.) He further testified that, because Companies participated in the proceedings before the FERC that resulted in PJM changing how it charged for line loss costs from average to marginal, Companies were aware in 2005 that the switch to calculating line loss costs on a marginal basis would increase their line loss costs but, despite this knowledge, they did not request approval to recover those costs as a part of their initial TSC calculations. (Customers' Statement No. 1 at 12–14, R.R. at 668a–70a.) Mr. Baron opined that the "future other costs" provision relied upon by Companies does not permit the recovery of line loss costs in the TSC Riders because increased line loss costs were not "unknown" costs since the Companies were aware that PJM was going to charge for line loss costs on a marginal basis, a result Companies supported. (Customers' Statement No. 1 at 15–16, R.R. at 671a–72a.)

In addition to Mr. Baron's testimony, the Commission found that Customers provided persuasive evidence that, during the 2006 RTP Proceedings, line loss costs were included in Companies' generation costs. That evidence consisted of statements and exhibits associated with the questioning of William D. Byrd during the 2006 RTP Proceedings, which indicated, *inter alia,* that Companies' generation rate caps included costs for "line losses." (Customers'

Exs. WDB–5 and FERC Financial Report, R.R. at 905a–09a.) Moreover, Companies' witness, Frank Graves, testified that line losses are dissipated energy and that "dissipated energy has to be replaced by increased generation." (MetEd Statement No. 3 at 20, R.R. at 285a; Penelec Statement No. 3 at 19, R.R. at 523a.) Finally, the TSC Riders did not specifically include "line losses" as one of the cost elements sought to be collected through those Riders. (Order at 2–3.)

The above-referenced testimony and evidence constitutes substantial evidence to support the Commission's findings. The fact that the Commission chose to credit or give more weight to Customers' evidence and expert witness's testimony and opinions than Companies' witnesses and evidence is not grounds for reversal; rather, those determinations are for the Commission as fact finder and cannot be reviewed on appeal. *Peak,* 509 Pa. at 276–77, 501 A.2d at 1388. Additionally, to the extent that Companies assert that the Commission mischaracterized the evidence in this matter, the record does not support this contention. To the extent the Commission relied on Mr. Baron's testimony regarding the work papers from the 1998 Restructuring Proceeding and 2006 RTP Proceeding, such reliance was not reversible error. Companies did not present evidence to rebut Mr. Baron's exhibits or evidence that line loss costs were excluded from generation charges, and these exhibits supported the Commission's determination because they were "illustrative of the intent of the parties." (Order at 20.) Had Companies not believed the line loss costs were transmission-related costs, as they now assert, there would have been no reason to include those costs in their generation-related costs in the prior proceedings. Finally, there was conflicting testimony regarding whether the inclusion of line loss

costs in the LMP and PJM's OATT established those costs as being transmission-related or generation-related. The Commission chose to accept the opinions and evidence that the LMP was related to the energy price and that the OATT includes both generation and transmission costs. Because this was a matter of credibility and evidentiary weight for the Commission to determine, it cannot be reconsidered on appeal. Thus, the Commission's findings of fact are supported by substantial evidence.

**B. Whether the Commission erred as a matter of law in concluding that line loss costs are generation-related.**

■ Companies next argue that the Order should be reversed because the Commission's determination that line loss costs are not transmission-related costs recoverable under the TSC Riders: (1) is inconsistent with the Commission's rationale and this Court's holding in *MetEd I*; (2) violates the Filed Rate Doctrine and is inconsistent with the FERC's characterization of line losses; and (3) is based on the Commission's improper reliance on Companies' treatment of distribution line loss costs.

**1. Section 2803 of the Competition Act and MetEd I**

Section 2803 of the Competition Act provides the following:

■ Transmission and distribution costs—**All costs directly or indirectly incurred to provide transmission and distribution services to retail electric customers.** This includes the return of

and return on facilities and other capital investments necessary to provide transmission and distribution services and associated operating expenses, including applicable taxes.

66 Pa.C.S. § 2803 (emphasis added). Neither the Code nor the Competition Act defines generation costs. The Commission is charged with enforcing the Code, including the Competition Act; therefore, the Commission's interpretation of the Code, the Competition Act, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous. *Popowsky v. Pennsylvania Public Utility*, 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997); *Energy Conservation Council v. Pennsylvania Public Utility Commission*, 995 A.2d 465 (Pa.Cmwlth.2010). "Judicial deference is even more necessary when the statutory scheme is technically complex, as it is in this case." *Popowsky*, 550 Pa. at 462, 706 A.2d at 1203. Interpreting tariffs is within the Commission's administrative expertise and should be given deference. *Aronson v. Pennsylvania Public Utility Commission*, 740 A.2d 1208, 1211 (Pa.Cmwlth.1999).

In *MetEd I*, this Court was asked to consider, *inter alia*, whether the Commission properly included "congestion costs" [9] in Companies' TSC Riders as transmission costs under Section 2803. Customers argued that, because there is a generation cost associated with congestion, those costs should be considered generation costs and be subject to the generation rate cap; however, this Court held otherwise. *Id.*, 960 A.2d at 198. Citing the definition of

---

9. Congestion occurs when there is not enough transmission capability to support all requests for transmission services and, in order to ensure reliability, transmission system operators re-dispatch generation to prevent transmission lines from being overloaded. *Pennsylvania Public Utility Commission v. Metropolitan*

*Edison Company*, 2006 Pa. PUC Lexis 116 *133–35. In the PJM, the cost of congestion is defined as the net cost of replacement power that must be supplied by other means to make up for the deliveries that cannot be executed as requested. *Id.*

transmission costs found in Section 2803, this Court concluded that the cost of switching electric generators and the cost of upgrading the transmission facilities, in the amount of $1.3 billion, were costs directly or indirectly incurred to provide transmission services to consumers. *Id.* Additionally, we explained that the Commission found that congestion costs should be classified as transmission costs because:

> (1) the [Companies] pay PJM for transmission services pursuant to the OATT, a transmission tariff; (2) the OATT includes a specific charge for transmission congestion, and the OATT bill that the [Companies] receive from PJM contains a separate charge for transmission congestion; (3) there would be no costs associated with PJM's switching of electric generators but for the congestion on the transmission grid; and (4) congestion costs are reduced by transmission upgrades, not generation upgrades.

*Id.*

Companies argue that the PJM-imposed line loss costs at issue in this case are indistinguishable from the PJM-imposed congestion charges involved in *MetEd I* and satisfy the four-pronged test set forth by the Commission in *MetEd I* and adopted by this Court in that case. Companies contend that, like congestion charges: PJM identifies line loss costs as transmission services and bills them as such; the OATT contains a separate charge for line losses; and their expert testified that, like congestion charges, it is the transmission system that causes line losses, which can be reduced by upgrading the transmission systems. (MetEd's Statement No. 3–R at 2–3, R.R. at 334a–35a; Penelec's Statement No. 3–R at 3, R.R. at 646a.) Thus, according to Companies, because they satisfied the four prongs set forth in *MetEd I*, line losses must be considered transmission costs re-

coverable under the TSC Riders and the Commission's contrary determination is erroneous.

The Commission did not err in holding that line losses are not transmission costs pursuant to Section 2803 of the Competition Act and *MetEd I*. The Commission interpreted the definition of transmission costs in Section 2803 of the Competition Act to exclude line loss costs because such costs are not incurred directly or indirectly to **provide transmission service.** Rather, line loss costs represent the generation-related costs associated with losses of energy as opposed to, for example, congestion costs, which represent the higher costs associated with **providing reliable transmission service** during times of peak usage. Additionally, OATT's definition of "transmission line losses" is "the loss of energy in the transmission of electricity," (Order at 14 (emphasis omitted)), and the Commission, in its interpretation of this term, chose to focus on the "loss of energy" factor of this definition rather than on the "transmission" factor, as Companies wanted. The Commission's interpretation of the definition of "transmission costs" in Section 2803 as excluding line loss costs is not clearly erroneous and, thus, that interpretation is entitled to great deference. *Popowsky,* 550 Pa. at 462, 706 A.2d at 1203. This Court cannot, therefore, substitute its judgment for the Commission's findings with regard to this issue, which is within the Commission's expertise. *Id.,* 550 Pa. at 457, 706 A.2d at 1201.

Companies contend that congestion costs and line loss costs are indistinguishable and, therefore, must be treated alike for the purposes of recovery under the TSC Riders. However, the Commission's determinations in *MetEd I* and the case before us reveal that these costs are not indistinguishable. In *MetEd I,* the Commission found that congestion costs, which

included the cost of upgrading the transmission facilities, were transmission-related costs under the facts and circumstances in that case and allowed Companies to recover such costs under the TSC Riders. We affirmed that determination because the costs were "directly or indirectly incurred to provide transmission services to customers." *MetEd I*, 960 A.2d at 198. Here, in contrast, the Commission found that line loss costs are costs associated with the loss or dissipation of **energy** and are generation-related costs, findings that are supported by substantial evidence as discussed above. This cost is different from the costs associated with providing reliable transmission service during times of peak usage, i.e., congestion costs. In essence, the Commission chose to believe Companies' evidence in *MetEd I* that congestion costs are transmission-related costs and Customers' evidence that line loss costs are generation-related costs in the present matter. Because the Commission is the ultimate fact finder and arbiter of credibility and evidentiary weight, Section 335(a) of the Code, 66 Pa.C.S. § 335(a), we are bound by the Commission's determination of those matters, *Peak*, 509 Pa. at 276–77, 501 A.2d at 1388. Moreover, line loss costs historically have been and are being collected as part of Companies' generation rates, subject to their generation rate caps,[10] thus, the Commission did not err in holding that such costs were not transmission-related. Finally, we note, as we did in response to Companies' substantial evidence challenge, that the inclusion of line loss costs in the OATT is not determinative, given the facts of this case, because the OATT includes both generation and transmission charges. Accordingly, the Commission did not err when it did not apply *MetEd I* to line loss costs.

### 2. The Filed Rate Doctrine and FERC Precedent

■ Companies next argue that the Commission's Order violates the Filed Rate Doctrine and is inconsistent with FERC's determinations that line loss costs are transmission-related costs. According to Companies, FERC identifies line loss costs as transmission charges, *see Atlantic City Electric Company v. PJM Interconnection, LLC*, 115 FERC ¶ 61,132 (2006) (*Atlantic City I*); *Pennsylvania–New Jersey–Maryland Interconnection, et al.*, 92 FERC ¶ 61,282 at 61,960 (2000), and because electricity transmission is within FERC's jurisdiction, FERC has the authority to determine just and reasonable wholesale rates for transmission service in interstate commerce and this authority preempts state regulations. *Mississippi Power and Light Company v. Mississippi ex rel. Moore*, 487 U.S. 354, 371, 374, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988). Companies assert that, pursuant to *Mississippi Power and Light Company*, a state may not prevent a utility from recovering FERC-approved costs from its retail customers. *Id.*, 487 U.S. at 370–71, 108 S.Ct. 2428. Companies contend that, by finding that line loss costs are generation-related, the Commission essentially second-guessed FERC's prior rate determinations, which it may not disregard.

The Filed Rate Doctrine precludes, *inter alia*, state utility commissions from reviewing FERC-approved rates, such as

---

10. Companies cannot recover generation-related costs through their transmission rates in order to circumvent the mandated generation rate cap. *ARIPPA v. Pennsylvania Public Utility Commission*, 792 A.2d 636, 668 (Pa. Cmwlth.2002). Pursuant to *ARIPPA*, Section 2804 of the Competition Act, 66 Pa.C.S. § 2804, does not permit a shifting of costs among the unbundled rate elements because such action would violate the integrity of rate caps. *Id.*

the rates to be charged to a utility's wholesale customers. *Nantahala Power and Light Company v. Thornburg*, 476 U.S. 953, 965–66, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). "Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable." *Id.* at 966, 106 S.Ct. 2349. Companies' argument relies on the premise that, factually, line loss costs are transmission-related costs that are "directly or indirectly incurred to **provide transmission ... services**," 66 Pa. C.S. § 2803 (emphasis added); however, the Commission did not find this as fact. It reviewed the evidence presented and, accepting Customers' evidence, the Commission found that these costs were generation-related and had been and are being recovered in Companies' generation rates. Moreover, our review of the FERC decisions relied upon by Companies, when read together and in their entirety, do not unambiguously state that such costs are transmission-related. Companies are correct that FERC stated that "marginal losses are part of the payment for transmission service," *Atlantic City Electric Company v. PJM Interconnection, LLC,* 117 FERC ¶ 61,169, 61,863 (2006) (*Atlantic City II* ); however, in that same decision, FERC stated "locational marginal prices [ (how line losses are calculated) ] are at the core of the PJM pricing methodology, because marginal prices send the proper price signals about the **cost of obtaining generation**." *Id.* at ¶ 61,862 (emphasis added). FERC then explained how line loss costs impact a utility's decision regarding from **which generator** to purchase energy. *Id.* Similarly, in *Atlantic City I*, FERC noted that requiring PJM to charge for line loss costs on a locational

marginal basis "ensures that each customer pays the proper marginal cost price for the **power it is purchasing**" and that, in using marginal pricing, "PJM would change the way that it dispatches **generators** by considering the effects of losses." *Id.,* 115 FERC at ¶ 61,478 (emphasis added). Finally, in *Pennsylvania–New Jersey–Maryland Interconnection,* FERC did refer to the amount of line losses as being related to transmission; however, it also indicated that "the price of line losses is related to generation, and the cost of generation is determined by LMP." *Id.,* 92 FERC at ¶ 61,960. Our review of this precedent shows that the FERC cases relied upon by Companies do not contain express language stating that line loss costs are transmission costs and, therefore, the Commission's Order is not inconsistent with this precedent.

Because FERC's opinions have not expressly stated that line loss costs are transmission costs, there is no direct conflict between the Commission's Order and FERC, unlike in *Nantahala Power & Light Company.* In *Nantahala,* FERC concluded that two electric utilities, Nantahala Power and Light Company (Nantahala) and Tapoco, Inc., subsidiaries of the Aluminum Company of America (Alcoa), were separate entities, but the state public utility commission decided that the two were "a single, integrated electric system." *Id.,* 476 U.S. at 958–59, 106 S.Ct. 2349. FERC also determined that Nantahala was entitled to 22.5%, not 20% as provided for by an agreement between Tapoco and Nantahala, of the entitlement power allocated by the Tennessee Valley Authority (TVA), which represented the amount of power Nantahala contributed to the TVA grid.[11] *Id.* at 958, 106 S.Ct. 2349. Entitle-

---

**11.** Unlike Nantahala, Tapoco, whose only customer was Alcoa, did not purchase additional power from the TVA. *Nantahala,* 476 U.S. at

956, 106 S.Ct. 2349. Tapoco and Nantahala were allocated 1.8 billion kilowatt hours of "entitlement power" from the TVA, of which

ment power was less expensive than purchased power and, therefore, the more entitlement power allocated to a utility, the lower that utility's rates would be for its customers. *Id.* FERC required Nantahala to revise its rates to reflect the increase in "entitlement power" from 20% to 22.5% and to refund any excess amounts collected. *Id.* In contrast, the Tennessee state public utility commission determined that Nantahala was entitled to 24.5% of the entitlement power; therefore, the state agency "not only expressly rejected the fairness of [certain contracts relied upon by FERC], but employed an allocation of entitlement power that nowhere takes into account FERC's allocation of that same power." *Id.* at 961, 106 S.Ct. 2349. These determinations directly affected Nantahala's costs and wholesale rates and, thus, constituted a violation of the Filed Rate Doctrine. *Id.* at 970–71, 106 S.Ct. 2349. As stated above, FERC's opinions with regard to line loss costs are unclear regarding whether such costs are generation-related or transmission-related. Thus, the direct conflict between the state commission's determination and FERC's determination in *Nantahala* is not present in the matter currently before this Court.

Companies also argue that the Commission's Order prevents them from recovering "trapped" transmission costs in contravention of *Nantahala*, in which the United States Supreme Court stated that "[w]hen FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate.... Such a

'trapping' of costs is prohibited." *Id.* at 970, 106 S.Ct. 2349. Once again, this argument is premised on the assumption that line loss costs are transmission-related, which the Commission rejected. Moreover, as Customers point out, the fact that the generation rate caps prevented Companies from fully recovering line loss costs does not result in an unlawful trapping of costs because Companies voluntarily extended that rate cap through December 31, 2010. In *Lloyd v. Pennsylvania Public Utility Commission*, 904 A.2d 1010 (Pa. Cmwlth.2006), this Court explained that:

> the "deal" the utilities made for receiving billions of dollars in stranded costs [12] was that rates were frozen for 54 months and that the utility was going to bear the risk of any increased costs in providing service unless the increased costs fell within one of the Competition Act's exceptions that allowed the utility to seek relief. The net effect of the Commission order [in *Lloyd* ] is to breach that regulatory bargain by impermissibly allowing [the utility] to recover expenses incurred during the rate cap period that it agreed to bear by receiving stranded costs.

*Id.* at 1023. Thus, in exchange for recovering stranded costs, Companies made a deal in which they would bear the risk of any increased costs that occurred before the expiration of the generation rate cap.

Accordingly, we conclude that the Order was not inconsistent with FERC precedent, did not violate the Filed Rate Doctrine, and did not improperly prevent Companies from recovering trapped costs.

---

Tapoco received 1.44 billion or 80% of that power. *Id.* The result of FERC's decision also decreased Tapoco's allocation to 77.5%. *Id.* at 972, 106 S.Ct. 2349. Other than to reduce Tapoco's allocation, there was little discussion of Tapoco in *Nantahala*.

**12.** Stranded costs essentially represent "the difference between the amount of revenue that could have been recovered in a regulated market and those recoverable under" deregulation. *Lloyd*, 904 A.2d at 1014.

*3. Whether the Commission erred by improperly relying upon the treatment of distribution line loss costs.*

Companies also argue that the Order must be reversed because the Commission erroneously based its determination that line loss costs were generation-related on the inclusion of distribution line loss costs in Companies' retail generation credit. In addition to challenging the merits of this position, Companies also assert that this argument was not made by any of the parties below and should not have been advanced by the Commission. However, this issue was presented to the Commission. Mr. Baron, Customers' expert witness, clearly testified regarding the treatment of distribution line loss costs and stated that no utility, including Companies, recover distribution line loss costs in their unbundled distribution charge, but these costs are recovered as part of the utility's generation rates. (Customers' Statement No. 1 at 17–18, R.R. at 673a–74a.) In elucidating this testimony, Customers focused on the fact that Companies treat a similar cost item, distribution line loss costs, as generation-related despite the fact that those losses occur during the distribution process.

On the merits of this issue, the Commission considered the treatment of distribution line loss costs to support its position that energy, i.e., what is lost through line losses, is not created by transmission but by generation and that energy losses, whether occurring through transmission or distribution, result in generation-related costs. The Commission noted the energy is also lost during its distribution to the end-use consumers and that such distribution line loss costs are recovered by the

retail generation credit and not in distribution rates. (Order at 14–15.) The Commission held that this was MetEd's position, which the Commission adopted, in *Application of Metropolitan Edison Company for Approval of Restructuring Plan*, 1998 Pa. PUC LEXIS 160 (June 30, 1998). We note that in *Application of Metropolitan Edison*, MetEd's position was that the cost of distribution line losses, i.e., energy lost during distribution, "should be arranged for and paid for **by the supplier**" and that "**line losses are generation related** and should be recovered as a separate charge to enable suppliers to competitively procure this service if they wish to do so." *Id.* at 168 (emphasis added). As the Commission points out in its Order, none of the parties in *Application of Metropolitan Edison* took exception to this position. The Commission relied upon this to support its parallel conclusions in the present matter that line losses, which occur during the transmission of energy, represent the amount of energy lost and that such losses result in generation-related costs not recoverable under the TSC Riders. We discern no error in the Commission's reliance.[13]

*C. Whether the Commission committed other errors of law that require the Order's reversal?*

■ Companies next assert that the Commission's Order should be reversed because the Commission violated Companies' due process rights by considering evidence—the Companies' DSP Filings—that was not made part of the record before the ALJ. According to Companies, the ALJ denied Customers' request to reopen the evidentiary proceedings to allow Customers to submit those documents and,

---

**13.** Because we conclude that the Commission did not err or abuse its discretion in determining that the line loss costs at issue here are generation-related, we will not address

Companies' assertion that the Commission erred in holding that, even if the line loss costs were transmission-related, Companies would not be entitled to retroactive recovery.

therefore, the Commission erred in rendering a decision based on facts not in the record. *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 45 Pa.Cmwlth. 610, 405 A.2d 1055, 1059 (1979) (holding that it is an error of law to consider evidence outside the record). Moreover, Companies argue that the Commission could not take judicial notice of those filings because, pursuant to the Commission's regulations, to do so, Companies would have been entitled to notice of those facts so that it could provide "additional facts" of which the Commission could take notice. 52 Pa.Code § 5.408(c)-(d). Additionally, Companies assert that they were denied a fair hearing because the Commission pre-determined the outcome of this case, as evidenced by the facts that the Commission did not address or acknowledge the Dissenting Statement or require Companies to refund their improperly collected line loss charges, but ordered those amounts to be placed in a segregated account for the benefit of mitigating future rate increases starting in 2011.

The Commission responds that Companies presented no evidence to support their claims that they were denied a fair hearing, and Customers assert that Companies' due process arguments are disingenuous given that the line loss argument was one of the few issues on which Companies did not prevail. Both the Commission and Customers contend that the Commission's direction for Companies to place monies improperly collected as transmission costs in an account to mitigate future generation rate increases was within the Commission's remedial discretion, consistent with its obligation to serve the best interests of the Commonwealth's retail ratepayers, and was not evidence of a pre-determined outcome.

Our review of the Order pertaining to whether line loss costs were generation-related or transmission-related reveals that the Commission did not consider the DSP Filings in making its determination that such costs were generation-related and not recoverable under the TSC Riders. (Order at 13–17.) The Commission did include the DSP Filings when describing the history of all the Companies' filings with the Commission for this, as well as other proceedings before the Commission. (Order at 5.) The Commission also included Customers' arguments pertaining to the effect of the DSP Filings. (Order at 12.) However, although the Commission included references to the DSP Filings in its Order, we conclude that the Commission did not rely on these facts, which were not included in the record before the ALJ, to determine that line loss costs were generation-related and not recoverable under the TSC Riders.[14] Thus, any error in referring to the DSP Filings was harmless.

■ We also discern no violation of Companies' due process rights in the Commission's failure to directly respond to the Dissenting Statement in the Order. Companies rely on *American Gas Association v. FERC,* 593 F.3d 14, 20 (D.C.Cir.2010), for the proposition that the Commission had an obligation to acknowledge the Dissenting Statement's position in the Order. However, we are unaware of any case law holding that a majority opinion violates a

---

14. To the extent that the Commission mentioned the DSP Filings in its analysis on retroactive recovery, it did so only to point out that the Companies' filings are just "one data point that acknowledges Commission precedent with regard to these Companies and this issue." (Order at 18.) We do not believe that this brief mention constitutes the Commission rendering a decision based on facts outside the record, *Equitable Gas Company,* 405 A.2d at 1059, such that any error was harmless, particularly where the Commission relied upon a number of other factors which were supported by the record evidence.

party's right to due process if the majority opinion does not specifically respond to the arguments made in a dissenting opinion. Moreover, a review of the Dissenting Statement indicates that it, in essence, agrees with Companies' analysis of this issue, i.e., that line loss costs are transmission-related, as well as the ALJ's initial determination allowing recovery. Thus, in rejecting those arguments in the Order, the majority of the Commission essentially did address the issues raised by the Dissenting Statement. Finally, the Companies' due process rights were not infringed upon by the Commission's Order directing Companies to place the monies it collected for line loss costs, which the Commission determined were **generation**-related costs, in an account to mitigate future **generation** rate increases resulting from the expiration of the generation rate caps. There is no evidence to support Companies' argument that this resolution demonstrated that the Commission's disposition in this matter was somehow pre-determined.

For the foregoing reasons, we conclude that the Commission's findings of fact are supported by substantial evidence and that the Commission did not abuse its discretion or commit an error of law in holding that line loss costs are generation-related costs and, therefore, not recoverable under Companies' TSC Riders.

## II. 632 C.D. 2010—Carrying Charges

The OSBA's Cross–Petition for Review relates to a different aspect of the Order, which purported to accept the ALJ's RD approving the Companies' request to collect carrying charges, i.e., interest, on the Companies' net under-collection of transmission costs. In 2006, as a part of the Companies' 2006 RTP filings, the Companies presented the Commission with a proposed plan to gradually increase their generation rates before the rate caps ended so

as to ease the transition between the capped and uncapped period. Their plan was to obtain electricity from different generation companies, which would then assume responsibility for a portion of the Companies' transmission costs. This would result in the Companies charging Pennsylvania customers higher generation rates, but lower transmission rates. To implement this plan, the Companies had to request the elimination of the existing generation rate caps from the Commission. The Companies included this request in their proposed TSC Riders filed in 2006, which sought, *inter alia,* to eliminate their existing generation rate caps and to move certain transmission-related costs, including congestion costs, from base rates into reconcilable TSC Riders. However, because the Companies were anticipating that the generators would pay part of the Companies' transmission costs, the Companies did not include those transmission costs in the transmission rates for which they sought approval. In its January 2007 Order, the Commission approved the TSC Riders, but did **not** approve the elimination of the existing generation rate caps.

The Companies, therefore, had to "unwind" the hypothetical generation contracts upon which they had based their lower transmission costs. Thereafter, the Companies filed with the Commission a compliance filing indicating that they had "unwound" the proposed generation contracts, but they did not simultaneously increase their anticipated transmission costs, which had been lowered in the proposed filings in the expectation that the generation companies would pay transmission costs. In other words, even though the lower transmission costs included in the 2006 RTP filings were no longer accurate since the Companies, not the new generators, remained responsible for those costs, the Companies did not adjust their esti-

mated transmission costs upward. This resulted in a shortfall of collected transmission costs, which the Companies sought to recover, with carrying charges, in their April 2008 TSC Rider reconciliation filings. The OSBA and Customers filed complaints, objecting to, *inter alia,* the Companies' collection of carrying charges on the transmission costs related to the unwinding of the generation contracts and line loss costs.

After an investigation and an evidentiary hearing, the ALJ recommended in the RD that the Companies be permitted to collect the carrying charges on the net amount of under-collected transmission costs. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.) Although the OSBA and Customers challenged the carrying charges associated with the under-collection of transmission costs based on line loss costs and those based on the unwinding of the generation contracts separately, the ALJ did not discuss each type of carrying charge separately. The ALJ initially concluded that the OSBA had waived its arguments regarding the carrying charges associated with the line loss costs because the OSBA raised this issue for the first time in its brief. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.) The ALJ did not address the OSBA's arguments regarding the carrying charges associated with the unwinding of the generation costs. Rather, the ALJ indicated that, after considering Customers' arguments, there were no legal impediments to allowing the Companies to collect the carrying charges on the net under-collected transmission charges and that the question was whether the inclusion of these carrying charges was unjust, unlawful, and unreasonable. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.) The ALJ rejected the Customers' argu-

ment that the Companies should not be allowed carrying charges because of their failure to more accurately forecast their transmission costs as being "punitive in nature." (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.) The ALJ concluded that the Companies presented evidence that adequately explained the circumstances surrounding the under-collection of the transmission costs, and noted that the claim for carrying charges is on the total net under-collection, and not on any specific under-collection of a specific cost element of the TSC. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.)

The OSBA and Customers filed exceptions, which the Commission "granted consistent with this Opinion and Order." (Order at 23.) The Commission also adopted the ALJ's RD, as modified, "consistent with this Opinion and Order." (Order at 23.) The Commission's Order neither makes any specific reference to the OSBA's exceptions to the ALJ's allowance of carrying charges nor to the ALJ's RD regarding the allowance of the carrying charges on the shortfall due to the unwinding of generation contracts, except to say that "[a]ny argument that is not specifically addressed herein shall be deemed to have been duly considered and denied without further discussion." (Order at 11.) The OSBA now petitions this Court for review on this issue.

■ The OSBA asserts that the Commission violated Section 703(e) of the Code, 66 Pa.C.S. § 703(e) (requiring that the Commission's findings be sufficient to enable a court on appeal to determine questions at issue and whether the Commission gave proper weight to the evidence), when it did not specifically address the OSBA's Exception No. 2 [15] and denied

---

15. In Exception No. 2, the OSBA asserted, *inter alia:*

Exception No. 2: The ALJ erred in recommending that the Companies be permit-

that Exception implicitly by stating "[a]ny argument that it is not specifically addressed herein shall be deemed to have been duly considered and denied without further discussion." (Order at 11.) Additionally, the OSBA asserts, *inter alia*, that, to the extent that the Commission simply adopted the ALJ's RD, the RD on this issue is likewise insufficiently detailed to satisfy the requirements of Section 703(e) and this Court's decision in *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission*, 677 A.2d 861 (Pa.Cmwlth.1996) (*NFG*). Finally, the OSBA asserts that allowing the Companies to collect carrying charges on the shortfall in transmission costs that derived from the unwinding of the generation contracts abandons the Commission's position, set forth in *Demand Side Management*, 1991 WL 501933, 1991 Pa. PUC Lexis 207 (*DSM*), that carrying charges should be allowed only where the Commission wants to encourage the particular activity that caused the carrying charges. The OSBA argues that, pursuant to Section 703(e) and *NFG*, if the Commission is going to reject its precedent, it must provide an explanation for doing so and did not do so here. Thus, according to the OSBA, the failure of the Commission to comply with Section 703(e) and *NFG* prevents the Court from performing its judicial review, determining whether the ALJ gave proper weight to the evidence presented or had substantial evidence to support the rejection of the OSBA's evidence and arguments, and requires this Court to remand this issue to the Commission to provide proper consideration of the OSBA's Exception No. 2.

■■■ In response, both the Commission and the Companies argue that the Commission's Order complies with Section 703(e) because this issue was fully addressed during the evidentiary and briefing stage of the proceeding, the RD was issued, the RD complied with Section 703(e), and the Commission adopted the RD on this issue in its entirety. The Commission and the Companies acknowledge that the RD may not have expressly rejected the OSBA's specific arguments, but the RD did expressly reject similar arguments made by Customers. The Commission is not required to expressly consider all of the arguments set forth by the parties in its Order. *Wheeling & Lake Erie Railway Company v. Pennsylvania Public Utility Commission*, 778 A.2d 785, 794 (Pa.Cmwlth.2001). Here, the Order indicates that it considered the OSBA's arguments and denied them, as evidenced by the Commission's lack of discussion of that Exception in the Order, and adopted the ALJ's RD on this issue because that result was not inconsistent with the Order. (Order at 11, 23.) Moreover, the OSBA's reliance on *NFG* on *DSM* is misplaced as

---

ted to recover interest on the claimed transmission costs resulting from the unwinding of generation contracts.
. . . .
The ALJ did not explicitly recommend that the Companies be permitted to collect carrying charges on the under-recovery of the Companies' transmission costs that resulted from the unwinding of generation contracts after the Commission rejected an attempt by the Companies to break the generation rate caps. However, he made an implicit recommendation to that effect when he rejected [Customers'] proposed disallowance of carrying charges, in general.
(OSBA's Exceptions at 19, R.R. at 1500a.) In Exception No. 1, the OSBA challenged the allowance of carrying charges associated with the line losses. Because the Commission concluded that line losses were not transmission costs recoverable under the TSC Rider, a conclusion that we affirm, the carrying charges associated with the line losses are likewise not recoverable under the TSC Rider.

*NFG* is distinguishable, and the ALJ's determination is not contrary to *DSM*.

Section 703(e) of the Code provides, in pertinent part:

(e) Decisions by commission.—After the conclusion of the hearing, the commission shall make and file its findings and order with its opinion, if any. **Its findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence.**

*Id.* (emphasis added). In *NFG*, we held that the Commission's failure to provide any analysis to support its decision on a particular issue or a sufficient explanation for changing its position from a prior, factually similar situation prevented this Court from performing judicial review. *NFG*, 677 A.2d at 864–65. Accordingly, we remanded the matter to the Commission to provide the analysis and rationale for its determinations. *Id.*

In *DSM*, the Commission was asked to consider whether to allow utilities to amortize certain capital investments and collect interest on the unamortized balance for amortized expenses. *Id.* at 525–26, 1991 Pa. PUC Lexis 207 at *31–32. The Commission concluded that, in unusual cases, the amortization of certain costs is appropriate for an extraordinarily large investment. *Id.* The Commission noted that, "[a]lthough we have often refused to allow interest or a return on the unamortized balance for amortized expenses (*Butler*

*Township Water Company v. Pennsylvania Public Utility Commission,* 81 [Pa. Cmwlth.] 40, 473 A.2d 219 ([Pa.Cmwlth.] 1984)), such a decision is discretionary." *DSM* at 525, 1991 Pa. PUC Lexis 207 at *32. It then concluded that, "[i]n circumstances where [the Commission] mean[s] to encourage the investment, and where the utility will not recoup its investment in one rate-collection period, interest or a return may be appropriate." *Id.* Accordingly, the Commission allowed the collection of interest in those cases where it expressly approved the amortization. *Id.*

Section 1301 of the Code, 66 Pa.C.S. § 1301, requires that every rate made or demanded by a public utility shall be just, reasonable, and in conformity with the regulations or orders of the Commission. *Id.* Thus, as recognized by the ALJ in the RD, the main question to be answered regarding the Companies' collection of carrying charges on the shortfall that resulted from the unwound generation contracts is whether those carrying charges are just, reasonable, and in conformity with the regulations and orders of the Commission, i.e., lawful. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.)

The OSBA asserts that the ALJ could not properly make a determination regarding the justness, reasonableness, and lawfulness of the Companies' request without considering its evidence and arguments, particularly its argument that allowing the Companies to charge current customers carrying charges created an inter-generational mismatch,[16] (*see* OSBA Statement

---

16. Brian Kalcic, the OSBA's expert, testified in his sur-rebuttal statement regarding inter-generational mismatch. He stated:

Cost shifting across time periods may result in inter-generational cost shifting among ratepayers, depending on the time period over which costs are recovered.

For example, it is likely that some of the ratepayers on whose behalf such transmission costs were incurred are no longer customers of either [of the Companies] and those customers will, therefore, avoid having to pay any of those costs. On the other hand, it is likely that some of the current ratepayers [of the Companies] will be re-

No. 2 at 1–3, R.R. at 784a–86a), as this argument was different from those made by Customers. Because the ALJ's RD, adopted by the Commission on this issue, neither offers an explanation or consideration of the OSBA's arguments and evidence nor does it address the two types of carrying charges separately, we agree with the OSBA that the part of the Order that relies on the RD's rationale for allowing carrying charges on the shortfall resulting from the unwound generation contracts is insufficiently specific to allow this Court to engage in meaningful judicial review. Therefore, in this regard, the Order does not comply with Section 703(e).

We first note that there are two types of shortfalls involved in this matter: (1) the shortfalls associated with line loss costs; and (2) the shortfalls resulting from the unwound generation contracts. Although the ALJ found that the OSBA waived its arguments regarding the carrying charges associated with line loss costs because it raised the issue for the first time in its main brief, i.e., after the close of evidence, the ALJ did not state that OSBA waived its arguments pertaining to the carrying charges associated with the unwound generation contracts. Indeed, had the ALJ done so, we would have had to reject such finding because the OSBA's expert witness, Brian Kalcic, specifically testified about this issue in his sur-rebuttal statement. (OSBA Statement No. 2 at 1–3, R.R. at 784a–86a.)

Notwithstanding the OSBA's evidence and repeated arguments on why allowing carrying charges on the shortfalls related to the unwound generation contracts would result an inter-generational mismatch, the ALJ made no reference to the OSBA's position in the RD. The position arguably raises legitimate questions about the reasonableness and justness of the proposed collection of carrying charges. The OSBA reiterated this position in its main brief to the ALJ after the close of the record. (OSBA's Main Br. at 5, 12, R.R. at 1201a, 1208a.) Nevertheless, the ALJ addressed only Customers' arguments in the RD, stating that he "considered those arguments," which focused on the Companies' failure to properly estimate and/or anticipate the increased transmission costs associated with marginal line losses and the unwound generation contracts, and rejected those arguments as "punitive in nature." (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.) The ALJ held that these arguments did not legally preclude the collection of carrying charges where the Companies provided a reasonable explanation for its shortfall and, therefore, the ALJ authorized carrying charges on the net under-collected transmission costs. (RD at 21, 45–46, R.R. at 1340a, 1364a–65a.)

Although we agree with the Commission that it is not required to expressly consider each and every argument a party raises, *Wheeling & Lake Erie Railway Company,* 778 A.2d at 794, it should expressly consider evidence and arguments that raise legit-

quired to pay such transmission costs even though they were not ratepayers of either Company at the time costs were incurred.
....
[The Companies' expert] argues that the actual time period over which costs are recovered is immaterial to ratepayers as long as the present value of the alternative payment streams is the same. That conclusion may be true in the case where the

population of the ratepayers remains unchanged over time. However, as previously discussed, shifting cost recovery across time periods may result in inter-generational cost shifting among ratepayers. Such an outcome would not be "fair" to *all* ratepayers.
(OSBA Statement No. 2 at 1–3, R.R. at 784a–86a (emphasis in the original).)

imate and significant questions regarding whether these proposed collection of carrying charges is just, reasonable, and lawful. The Commission points to this Court's decision in *University of Pennsylvania v. Pennsylvania Public Utility Commission,* 86 Pa.Cmwlth. 410, 485 A.2d 1217 (1984), in which we stated that "[w]e have held and we here repeat that it has never been the law of this Commonwealth 'that an administrative agency must set forth findings specifically noting the rejection, and reasons for such rejection, of each and every *minor* allegation of a party.'" *Id.* at 1222–23 (quoting *Application of Midwestern Fidelity Corporation,* 26 Pa.Cmwlth. 211, 363 A.2d 892, 902 n. 6 (1976)) (emphasis added). However, this was not a minor allegation, but was one of two arguments the OSBA asserted against allowing the Companies to recover carrying charges based on the unwound generation contracts in the amount of more than $32 million for MetEd and $14 million for Penelec.[17] Here, the ALJ and, subsequently, the Commission failed to address or consider the OSBA's legitimate argument and evidence on this issue in sufficient detail so as "to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence." 66 Pa.C.S. § 703(e). Thus, pursuant to Section 703(e) and *NFG,* we must remand this particular issue to the Commission for it to provide analysis and explanation for its determination regarding the OSBA's Exception No. 2.

Moreover, the ALJ did not separately address the two types of shortfalls involved in this matter by cause, i.e., the shortfalls associated with line loss costs versus those resulting from the unwound generation contracts. Given our holding affirming the Commission's determination that the line loss costs are not transmission costs and, therefore, are not recoverable in the TSC Riders, the carrying charges associated with the line loss costs likewise may not be recovered. However, because the ALJ combined its analysis on both types of the carrying charges, we have no way of determining whether that analysis supports the Commission's determination on the remaining issue, whether the Companies' request for carrying charges associated with the unwinding of the generation contracts is just, reasonable, and lawful. We note that, if the Commission determines that the Companies are allowed to collect carrying charges, those amounts should reflect only those under-collected transmission costs associated with the unwinding of the generation contracts, not the line loss amounts.

The Commission and Companies argue that *NFG* does not require remand. Although *NFG* is factually distinguishable from this case, the import of *NFG* is not its facts, but its holding that the Commission must provide this Court with sufficient analysis to engage in appellate review. As in *NFG,* here, we "simply cannot tell as a matter of law whether the [Commission] abused its discretion or not." *NFG,* 677 A.2d at 864 (quoting *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 47 Pa.Cmwlth. 512, 409 A.2d 446, 453 (1979)). The Commission also asserts that the authorization of carrying charges here is not inconsistent with the standard set forth in *DSM* and, therefore, it did not abandon its precedent so as to require it to provide specific analysis on this issue as required by *NFG.*

---

17. These are the amounts Mr. Baron testified were the amounts of carrying charges at the time he testified in November 2008. (Customers' Statement No. 1 at 24–25, R.R. at 680a–81a.) Thus, these numbers likely have only increased since Mr. Baron testified.

However, because the ALJ's RD, adopted by the Commission, does not provide this Court with sufficient information about the rationale in allowing the Companies to collect carrying charges on the shortfall due to the unwinding of the generation contracts, we cannot address the reasons why or why not *DSM* would require a different result. We do note that, in its main brief to the ALJ and in its exceptions to the Commission, the OSBA raised its assertions that the grant of carrying charges in this matter would conflict with *DSM*. (OSBA's Main Br. at 10–13, R.R. at 1206a–09a; OSBA's Exceptions at 21–23, R.R. at 1502a–04a.) The ALJ never addressed the OSBA's contentions regarding *DSM* in the RD and the Commission offers, for the first time in its brief to this Court, many reasons why *DSM* does not require a different result. However, the more appropriate place for the Commission to have addressed this issue would have been in its Order. Because we are remanding this issue to the Commission to address the OSBA's Exception No. 2, the Commission should also address the OSBA's contention that *DSM* requires the denial of the request for carrying charges based on the unwinding of the generation contracts.

Accordingly, the Order is hereby: (1) affirmed to the extent that it holds that line loss costs are not transmission costs and, therefore, not recoverable under the TSC Riders and that the carrying charges associated with line loss costs are likewise not recoverable; and (2) vacated to the extent that it allows the Companies to collect carrying charges on the under-collected transmission costs associated with the unwinding of the generation contracts. We remand the matter to the Commission to expressly consider the OSBA's Exception No. 2 in a manner consistent with this opinion.

## ORDER

**NOW,** June 14, 2011, the Order of the Pennsylvania Public Utility Commission (Commission) is hereby: (1) affirmed to the extent that it holds that line loss costs are not transmission costs and, therefore, not recoverable under Metropolitan Edison Company's and Pennsylvania Electric Company's (Companies) TSC Riders and that the carrying charges associated with line loss costs are likewise not recoverable; and (2) vacated to the extent that it allows the Companies to collect carrying charges on the under-collected transmission costs associated with the unwinding of the generation contracts. We remand the matter to the Commission to expressly consider William R. Lloyd, Jr., Small Business Advocate's Exception No. 2 in a manner consistent with this opinion.

Jurisdiction relinquished.